## KINNEY–COASTAL OIL CO. et al. v. KIEFFER et al.

(District Court, D. Wyoming. October 18, 1924.)

No. 1458.

1. **Public lands** ☞39(2)—**As respects right to establish town site thereon, practically entire surface of tract held needed for operation of oil leases.**

As respected right of homestead entryman and his vendees to maintain and establish town site on lands subject to mineral lease, *held*, that practically entire surface would be necessary for reasonably economical operation of tract by lessees.

2. **Public lands** ☞39(2)—**Homestead entryman not entitled to establish town site on tract as against mineral lessee, and establishment would be enjoined.**

Where tract leased by government under Mineral Leasing Act Feb. 25, 1920 (Comp. St. Ann. Supp. 1923, §§ 4640¼–4640¼ff, 4640¼g–4640¼ss), was "spotted" for prospective wells and one well was producing, homestead entryman under Act July 17, 1914 (Comp. St. §§ 4640a–4640c), *held* not entitled to establish town site thereon, where homestead entry was for agricultural purposes, and lessees had acted in reliance thereon, and entryman had knowledge thereof, and mineral lessees were entitled to injunctive relief, remedy at law being inadequate.

In Equity. Suit by the Kinney-Coastal Oil Company and another against Michael F. Kieffer and others. Decree for plaintiffs.

Haggard & O'Mahoney, of Cheyenne, Wyo., and John D. Milliken, of Denver, Colo., for plaintiffs.

Hagens & Murane, of Casper, Wyo., for defendants.

KENNEDY, District Judge. This is a suit in equity, through which the plaintiffs, as mineral lessees of the government, seek an injunction against the defendants from maintaining and pursuing the establishment of a town site upon a portion of land within the confines of what is known as the Salt Creek oil field. The defendants by appropriate pleading resist the suit.

The controversy arises out of the withdrawal of public lands chiefly valuable for mineral, the enactment by Congress of a statute permitting the surface entry of lands of that character under the general land laws, reserving to the government all mineral rights, and the subsequent passage by Congress of the Mineral Leasing Act of February 25, 1920 (Comp. St. Ann. Supp. 1923, §§ 4640¼–4640¼ff, 4640¼g–4640¼ss). The gist of the dispute is over the use of the surface between a homestead entryman and an oil lease claimant. Such legislation on its face produces a fertile field for the development of litigation and this court, so far as research has developed, finds itself without precedent in disposing of the issues here involved.

The authorities cited by counsel in their briefs submitted within the time fixed by the court are valuable as sustaining various propositions of law contended for, and yet it seems to this court that, in the solution of the peculiar questions which arise here, we must pioneer to a degree. The facts established upon the trial, either by evidence adduced or the court's judicial knowledge, and not in dispute, appear to be substantially as follows:

The land in dispute is described as the southwest quarter of the southwest quarter of section 20 and the northwest quarter of the northwest quarter of section 29, township 40 north, of range 78 west of the sixth principal meridian, in the county of Natrona, state of Wyoming. This land is a portion of the land withdrawn from entry because of its supposed mineral value, by presidential orders of September 27, 1909, and July 2, 1910, the latter being under an express congressional enactment. On July 17, 1914, Congress passed an act entitled "An act to provide for agricultural entry of lands withdrawn, classified, or reported as containing phosphate, nitrate, potash, oil, gas, or asphaltic minerals." 38 Stat. 509 (Comp. St. §§ 4640a–4640c). This act in substance provides for the entry of withdrawn or classified lands under the nonmineral land laws of the United States with a reservation, however, to the United States of all kinds of mineral found in or under such lands. It further provides that all patents to the land shall contain such reservation, that a qualified person may under certain regulations enter upon said land to prospect for mineral, and that a person acquiring rights from the United States to remove the mineral may occupy so much of the surface as may be required for all purposes reasonably incident to such removal, provided bonds be given for the benefit of

the owner of the surface to indemnify him against such damage as he may suffer.

In April, 1919, the defendant Kieffer filed an agricultural homestead entry upon lands, including the 80 acres here in controversy, and thereafter proceeded to establish his residence thereon and make improvements to the surface. On February 25, 1920, Congress passed what is commonly known as the Mineral Leasing Act. On June 15, 1921, under the authority of that act and the regulations promulgated by the Interior Department, the mineral content of the land in controversy was offered for lease at public auction, for which the plaintiffs were the highest bidders, paying a bonus of $51,000 and a royalty of some 25 per cent. of the oil produced, and a lease was subsequently granted to the plaintiffs in December, 1921. In this lease reservation was made by the government of the right to dispose of so much of the surface of the land as was not necessary for the extraction of the oil found therein. During the spring of 1922 the plaintiffs commenced drilling operations by the erection of the necessary improvements upon one portion of the leased premises, and as a result in August, 1923, a producing well was brought in. At or before this time the entire 80 acres was marked, or, in the phraseology of the oil fields, "spotted," for additional wells on each 10 acres thereof. On October 12, 1923, the defendant Kieffer received a patent for his homestead entry, which patent contained a mineral reservation as provided by the Act of July 17, 1924.

On January 1, 1924, Kieffer and his wife, both defendants in this case, filed a town-site plat upon the 80 acres in controversy here, under the laws of the state of Wyoming, and a short time thereafter filed an amended plat. Subsequent to this the surface of the land in controversy was laid out into lots and blocks, and the defendants proceeded to sell to various persons lots according to the designation in the town-site plat, and to deliver deeds to the purchasers of the same; each deed, however, containing the same reservation as to mineral rights as was contained in the homestead patent to Kieffer. Following these sales of lots, the purchasers thereupon took possession and in many cases erected buildings of various kinds, including ordinary frame shacks, canvass tents, and small business buildings, so that at the time of the commencement of the suit, or shortly thereafter, there were in the neighborhood of 80 different buildings scattered over the tract covered by the town site, and sales had been conducted to such a degree that nearly two-thirds of the entire number of lots had been either sold or contracted to be sold. The defendants offered proof to the effect that the lots immediately surrounding plaintiffs' well locations had been reserved, and would not be offered for sale.

Some of the principal questions of fact in dispute are the following: Testimony was offered on behalf of the plaintiffs that a tract of land immediately east of the tract in controversy, and which was not on the commonly recognized oil structure, was owned by the principal defendants as a part of their original homestead, and was available by them for town-site purposes without being in danger of conflict with oil operations. The testimony of the defendants was directed to the point that this tract of land was not physically as well adapted to a town site as was the land in controversy. There appears from the testimony to be no practical system of fire protection afforded to the town, it being necessary to secure water for domestic uses from wells. In this respect the plaintiffs' testimony tends to show that the operation of an oil field in the very midst of a town would be exceedingly dangerous from the standpoint of fire hazards. Testimony was also offered to the effect that a town site was necessary in that vicinity to afford homes to the large number of employés of the Salt Creek field; the nearest town being Midwest, about three miles distant, which is owned by the oil company bearing that name, in which title rights to real estate cannot be secured by prospective homemakers.

Sharp dispute between the plaintiffs and defendants as to the substantive facts arose over their divergent contentions as to the amount of surface necessary to operate the tract as an oil field. The evidence of the plaintiffs tended to show that, when the entire field had been drilled in an approved manner, practically the entire surface would be necessary for its operations, while the defendants' evidence was directed to the conclusion that the amount of the surface reserved around the "spotted" wells would be sufficient to provide for the successful operation of the tract. Another item sharply in dispute was as to the boundary lines of the recognized oil structure; the testimony of plaintiffs tending to show that practically the entire tract was within the recognized Salt Creek oil structure, while the evidence of the defendants tended to show that the outer eastern line of the structure was such

as to include only the producing well and perhaps three others of the "spotted" locations.

As to the facts in dispute, the court is of the opinion that the weight of the testimony sustains a conclusion that the tract is practically all within the structure. This conclusion is arrived at particularly after hearing the evidence of the government experts to the effect that it may reasonably be anticipated that there is oil under the tract in lower sands than that from which it is now being produced, and which, if the theory be correct, would somewhat enlarge the boundary lines, so as to include the entire tract, and to any such oil plaintiffs are entitled under the law. As to the availability of other lands in the vicinity for town-site purposes and belonging to the principal defendants, the court believes the evidence sustains a conclusion that other tracts in the immediate vicinity and clearly off the structure are reasonably available, even if not physically quite so well adapted.

[1] The most difficult of the disputed questions of fact to be determined is the amount of surface reasonably necessary to operate the tract as an oil field, assuming that there would be a reasonable expectancy of its producing oil from wells located at approved intervals substantially over its entire surface. In this respect it must be said that there is no doubt that oil wells have been and are now frequently located in the very midst of towns and villages, with derricks being interspersed among dwellings and other buildings; but it cannot well be contended that such a situation is ideal or free from extraordinary hazard, added expense, and considerable inconvenience. It appears to be customary in the oil-producing business, when a tract has been drilled up in an approved manner, to connect the different wells with pipes or a central pumping plant leading to a common battery of receiving tanks, so that all the wells may be operated at one and the same time with one set of machinery. Assuming this to be the fact, it would be difficult to conceive how the tract could be operated in the generally approved method in the midst of closely located buildings without subjecting the operator, in addition to the hazards which have heretofore been mentioned, to a considerable added expense of operation. This, therefore, leads to the conclusion that under ordinary circumstances, such as found in the case at bar, practically the entire surface, so far at least as it would be in conflict with closely located buildings, would be necessary for the reasonably economical operation of the tract.

[2] We are now led to a discussion of the legal principles involved. In substance it is the contention of the defendants that, when a patent to the surface is issued, they may use it in any manner that they see fit, provided, of course, in accordance with the reservations in the patent, that they recognize in a reasonable degree the right of the plaintiffs to conduct their oil producing operations under their lease, and that the facts in the case show that the town site may be maintained without any extraordinary inconvenience or expense to the defendants in conducting those operations.

The tract was a withdrawn area, and not subject to entry, except by virtue of the Act of July 17, 1914, which permitted surface right entry under the other land laws. Of this, of course, the defendants were cognizant at the time they made their homestead entry and received their patent. It must also be recognized that the entry in this case, being a homestead entry, was for agricultural purposes, and that this was, at the time the entry was made, the purpose for which the defendant intended it. Likewise, at the time the plaintiffs bid in and secured the lease, it was constructively known to them that the surface rights had been granted to a homesteader for agricultural purposes, and that with this situation and no other they would be expected to cope in conducting their drilling operations upon the tract. The surface entry act specifies that a bond shall be given by a person acquiring the mineral rights to pay damage which may be suffered by the surface entryman to crops and improvements, not only in prospecting, but in operating under a lease. The term "crops" clearly refers to agriculture, and the term "improvements," in the connection in which it is found, can reasonably have no other significance than those of an agricultural nature.

To hold that under these circumstances the operating lessees should be required to incur the added hazard and expense of operating the tract in the midst of a town site, when it was not within their contemplation at the time they paid the large bonus and agreed to pay the additional large royalty to the government upon securing their lease, in the face of the additional circumstance that the entryman for agricultural purposes knew of the reserved right to occupy the surface for the purpose of extracting the oil, would, it seems to this court, throw an additional heavy burden upon the operators,

which in equity they should not be required to assume.

Before the town site was started the tract was all "spotted" with places for prospective wells, and one well was in the producing stage. In attempting to put the surface to the use of a town site, therefore, the entryman knew that the development of the tract for the extraction of oil had started. He likewise knew, or should have known, that it was within the contemplation of the lessees that they would be confronted only with conditions, inconveniences, expenses, and damages resulting from the agricultural use of the land by the surface owner. A different situation may have presented itself, had the town site been started before the lease was granted to the plaintiffs. This court does not wish to be understood as holding that under no circumstances could the owner of a homestead use a portion or all of it for town-site purposes, even though it may be within a withdrawn mineral structure. The point in this case, and upon which it must be determined, is that the rights of the plaintiffs were fixed and determined before there was any attempt to turn the surface into a town site, and of these the defendant owner of the surface rights was fully cognizant.

The court is further convinced that the situation presented here is one in which a court of law would afford no adequate relief, and that the facts clearly disclose the amount in controversy to be beyond the statutory limitation, so as to give the court jurisdiction.

The findings of fact and the conclusions of law will therefore be in favor of the plaintiffs, in accordance with the views herein expressed, and a decree in general accord with the prayer of the bill will be entered, reserving to defendants their proper exceptions in the premises.