**BELLE FOURCHE PIPELINE COMPANY, a Wyoming corporation, and Eighty–Eight Oil Company, a partnership, Petitioners,**

v.

**The STATE of Wyoming, the Environmental Quality Council of the State of Wyoming, Randolph Wood, as Director of the Department of Environmental Quality, Roger Shaffer, as Administrator of the Land Quality Division of the Department of Environmental Quality, and Thunder Basin Coal Company, Respondents.**

No. 86–144.

Supreme Court of Wyoming.

Dec. 16, 1988.

Rehearing Denied Jan. 9, 1989.*

---

* Chief Justice Cardine not participating.

R. Stanley Lowe and Manuel A. Lojo, Casper, for petitioners.

A.G. McClintock, Atty. Gen., Stephen R. Shanahan, Sr. Asst. Atty. Gen., and Michael N. Patchen, Legal Intern, for respondent, State of Wyoming.

Marilyn S. Kite and Lawrence J. Wolfe, Holland & Hart, Cheyenne, for respondent, Thunder Basin Coal Co.

Before CARDINE, C.J., THOMAS, URBIGKIT and MACY, JJ., and BROWN, J., Retired.

THOMAS, Justice.

The problem that must be solved in this appeal is whether a long-term lessee of land or the holder of a right-of-way easement is a "surface landowner" or "surface owner," alluded to in §§ 35–11–406(b)(xii) and 35–11–416, W.S.1977, and entitled to the protection of the statutory provisions requiring consent of a "surface landowner" and the posting of a bond to protect the "surface owner or owners." Collateral questions are presented with respect to whether an administrative agency is required to consider questions raised concerning the validity of its rules in the context of a contested case hearing, and whether the Wyoming Department of Environmental Quality, Land Quality Division Rules and Regulations, Ch. IV, § 3.k. (1985) [hereinafter Ch. IV, § 3.k.] (relating to a requirement that mining operations be conducted in order to minimize disruption of any services provided by facilities within the permit area) is lawful. The Environmental Quality Council (EQC) granted a coal mine permit in response to the application of Thunder Basin Coal Company without affording Belle Fourche Pipeline Company and Eighty–Eight Oil Company the protection afforded by §§ 35–11–406(b)(xii) and 35–11–416, W.S.1977. It held that the applicant had met its burden of proof in demonstrating that the application was in compliance with applicable state laws and that it was appropriate to invoke Ch. IV, § 3.k. Belle Fourche Pipeline Company and Eighty–Eight Oil Company appealed the decision of the Environmental Quality Council to the district court which certified the case to this court in accordance with our rules of appellate procedure. We affirm the decision of the Environmental Quality Council.

Belle Fourche Pipeline Company (Belle Fourche) and Eighty–Eight Oil Company (Eighty–Eight) state the issues in this way:

"I. Whether the Environmental Quality Council erred in finding that neither Appellant is entitled to the protections of §§ 35–11–406(b)(xii) and 35–11–416?

"II. Whether the Environmental Quality Council erred in finding that Appellee Thunder Basin Coal Company has met its burden of proof in that its application is in compliance with all applicable state laws?

"III. Whether the Environmental Quality Council erred in failing to find Chapter IV Section 3.k. of the Land Quality Division rules invalid, either of itself or as applied in this matter?

"IV. Whether the Environmental Quality Council erred in failing to respond to Appellant's contention that said rule, either of itself or as applied, is invalid."

Thunder Basin Coal Company (Thunder Basin) frames the issues as follows:

"I. Whether the Environmental Quality Council correctly determined that the interests held by Appellants did not qualify them as 'surface landowners' under W.S. § 35–11–406(b)(xii) or as a 'surface landowners' under W.S. § 35–11–416.

"II. Whether the Land Quality Division Rules and Regulations, Chapter IV, Sec. 3.k. are unlawful.

"III. Whether the surface owner consent statute, if construed to apply to appellants, is unconstitutional because it is preempted by federal law and violates the guarantees of Equal Protection."

The State of Wyoming, on behalf of the EQC, articulates these issues:

"1. Are a lessee of land and the holder of an easement surface landowners or surface owners within the meaning of W.S. 35–11–406(b)(xii) and 35–11–416?

"2. Is DEQ Land Quality Rule IV(3)(k) unlawful?

"3. Is it necessary to remand an administrative agency order for failure by the agency to make findings concerning a legal issue when that issue is before the Supreme Court on appeal?"

We will address whether either a long-term lessee of the surface or the holder of a right-of-way easement comes within the terms "surface landowner" or "surface owner" as used in §§ 35–11–406(b)(xii) and 35–11–416, W.S.1977; whether the EQC was required to consider the validity of its rules in the context of a contested case hearing; and, if so, whether Ch. IV, § 3.k. is lawful. The resolution of these questions is dispositive of this case and, for that reason, it is not necessary to address the questions posed in Issue II urged by Belle Fourche and Eighty–Eight and Issue III presented by Thunder Basin.

On November 1, 1967, Atlantic Richfield Company (ARCO) obtained Federal Coal Lease No. W–3446, which granted ARCO the right to mine coal by surface mining methods. That lease covered the coal in Section 21, Township 46 North, Range 70 West, 6th P.M., in Campbell County, Wyoming, as well as other lands. Robert Deaver and Freda Dunlap owned the surface estate in Section 21, and, on May 1, 1970, they leased a portion of that section to Black Hills Oil Marketers, Inc., for a term of ninety-nine years. That lease was assigned to Eighty–Eight, which operates a truck receiving station for oil on the property. The station is equipped with a tank, pumps, meters, valves, piping, ladders, and other equipment, and annually it receives approximately 10,000 barrels of oil from producing wells in the area which are outside the subject property.

In November of 1970, Robert Deaver and Freda Dunlap granted to Belle Fourche a right-of-way for oil and gas pipelines across portions of Section 21. In February of 1971, they granted a second right-of-way to Belle Fourche for oil and gas pipelines. Belle Fourche constructed, and continues to operate, two common carrier oil pipelines, which serve Eighty–Eight's truck receiving station and are situated in part within Section 21.

On November 3, 1976, ARCO acquired the surface of Section 21 pursuant to a warranty deed from Robert and Evelyn Deaver. The record does not disclose whether Freda Dunlap still held an interest in the surface of Section 21, but the record seems to assume that ARCO acquired complete ownership to the surface subject to "all rights of way, easements, exceptions, reservations and any and all instruments of record as of the date of this Warranty Deed, the provisions of which instruments touch and concern, or pertain to, the lands conveyed hereby." There is no question that Eighty–Eight and Belle Fourche had recorded the lease and the easements and that the acquisition by ARCO of the surface estate was subject to those interests.

ARCO applied to the Department of Environmental Quality (DEQ) for a permit to mine Section 21. The DEQ then issued to ARCO a Permit to Mine and a License to Mine, No. 483, effective March 16, 1979. That permit authorized ARCO to begin mining operations in what was designated as the Coal Creek Mine within the designated permit area for a period of five years. The permit accorded with the interim program adopted by the State of Wyoming pursuant to the Federal Surface Mining Control and Reclamation Act, 30 U.S.C. §§ 1201–1328 (1977) (SMCRA). ARCO began construction of the Coal Creek Mine in the permit area in 1979, and actual production of coal commenced in 1982.

In the meantime, in December of 1980, ARCO filed an application for modification of its existing interim permit for the Coal Creek Mine. The purpose of that application was to bring that permit into compliance with what had become Wyoming's permanent state program under SMCRA. Among other things, that application provided all utilities, including oil and gas pipelines, would be relocated away from the active mining area prior to the initiation of surface mining activities. The DEQ approved the new application after finding that it was technically complete. Notice of that application was published in March of 1985, and that notice was sent to the owners of record of surface rights within the permit area including Eighty–Eight and Belle Fourche.

Various objections were filed opposing the issuance of the permit to mine which, with the approval of the DEQ, had been

transferred from ARCO to Thunder Basin, a wholly-owned subsidiary of ARCO. Eighty–Eight and Belle Fourche presented objections to the issuance of the permit. These entities alleged that the proposed mining activities sought in the permit application would require a removal of their facilities which are located within the permit area, or would result in a cessation of their operations. Eighty–Eight and Belle Fourche refused to withdraw their objections, and a contested case hearing was held before the DEQ's Environmental Quality Council on September 10, 1985. Belle Fourche and Eighty–Eight agreed to limit their objections to the area which would be impacted by Thunder Basin's proposed mining operations during the first five-year term sought under the permit which expires in 1988.

Following the hearing, the EQC issued its Findings of Fact, Conclusions of Law and Order, granting Thunder Basin a permit to mine and rejecting the contention of Belle Fourche and Eighty–Eight that they were entitled to the protections provided in the consent and bonding provisions of §§ 35–11–406(b)(xii) and 35–11–416, W.S. 1977. Belle Fourche and Eighty–Eight then filed their petition for review of the decision of the EQC in the District Court of the Sixth Judicial District in and for Campbell County. Thunder Basin and the EQC jointly presented a petition for certification to this court which the district court granted.

The parties to this appeal are in accord that relocation of the Belle Fourche and Eighty–Eight facilities is necessary, as well as operationally and economically feasible. The parties have not agreed with respect to which of several potential locations would best serve the interests of Belle Fourche and Eighty–Eight, nor have they reached any meeting of the minds as to who should bear the relocation costs. The justification for this appeal is found in the disagreement as to who shall bear the costs of relocation, with Belle Fourche and Eighty–Eight desiring to have security in the form of a bond posted by Thunder Basin which they contend they are entitled to as "surface owners" under the statute.

The crux of this case requires a definition of which persons or entities are included within the statutory terms "surface land owners" or "surface owners." The material statutory provisions state in relevant part:

"(b) The application shall include a mining plan and reclamation plan dealing with the extent to which the mining operation will disturb or change the lands to be affected, the proposed future use or uses and the plan whereby the operator will reclaim the affected lands to the proposed future use or uses. The mining plan and reclamation plan shall be consistent with the objectives and purposes of this act and of the rules and regulations promulgated. The mining plan and reclamation plan shall include the following: Section 35–11–406(b), W.S.1977.

"(xii) For any application filed after March 1, 1975, including any lands privately owned but not covered by the provisions of paragraph (b)(xi) of this section an instrument of consent from the *surface landowner*, if different from the owner of the mineral estate, to the mining plan and reclamation plan. If consent cannot be obtained as to the mining plan or reclamation plan or both, the applicant may request a hearing before the environmental quality council." (emphasis added) Section 35–11–406(b)(xii), W.S.1977.

"(a) In those instances in which the *surface owner* is not the owner of the mineral estate proposed to be mined by mining operations a permit shall not be issued without the execution of a bond or undertaking to the state, whichever is applicable, for the use and benefit of the *surface owner or owners* of the land, in an amount sufficient to secure the payment for any damages to the surface estate, to the crops and forage, or to the tangible improvements of the *surface owner.*" (emphasis added) Section 35–11–416, W.S.1977.

The thrust of these two statutory provisions is to afford to "surface land owners" or "surface owners" the opportunity to refuse consent to a mining applicant to enter

that "surface owner's" or "surface land owner's" property for the purpose of conducting mining or reclamation operations (§ 35–11–406(b)(xii)) and to require that a bond be posted for the purpose of insuring compensation for any damages resulting to the surface estate from the mining operations, including damages to crops, forage, or tangible improvements. Section 35–11–416, W.S.1977.[1]

Whenever this court is engaged in the construction of a statute, the primary consideration is to discern the intention of the legislature. *State Board of Equalization v. Tenneco Oil Company,* 694 P.2d 97 (Wyo.1985); *State ex rel. Motor Vehicle Division v. Holtz,* 674 P.2d 732 (Wyo.1983); *Oroz v. Hayes,* 598 P.2d 432 (Wyo.1979). That legislative intent should be ascertained, as nearly as is possible, from the language incorporated in the statute, which is viewed in the light of its object and purpose. *K N Energy, Inc. v. City of Casper,* 755 P.2d 207 (Wyo.1988); *Amoco Production Company v. State Board of Equalization,* 751 P.2d 379 (Wyo.1988); *State Department of Revenue and Taxation, Motor Vehicle Division v. Andrews,* 671 P.2d 1239 (Wyo.1983); *In re Adoption of MM,* 652 P.2d 974 (Wyo.1982); *Board of County Commissioners of Campbell County v. Ridenour,* 623 P.2d 1174 (Wyo. 1981), reh. denied 627 P.2d 163 (Wyo.1981); *Oroz,* 598 P.2d at 432; *School Districts Nos. 2, 3, 6, 9, and 10, in Campbell County v. Cook,* 424 P.2d 751 (Wyo.1967). In those instances in which the language in the statute is plain and unambiguous, the words used are to be accorded their plain and ordinary meaning unless there is some manifestation of a legislative intent that

they not be accorded the plain and ordinary meaning. *Amoco,* 751 P.2d at 379; *Thomson v. Wyoming In–Stream Flow Committee,* 651 P.2d 778 (Wyo.1982); *Wyoming State Department of Education v. Barber,* 649 P.2d 681 (Wyo.1982); *Croxton v. Board of County Commissioners of Natrona County,* 644 P.2d 780 (Wyo.1982).

The plain and ordinary meaning concept often directs us to dictionary definitions. Those who are entitled to the protection afforded by §§ 35–11–406(b)(xii) and 35–11–416, W.S.1977, are described as "surface landowners" and "surface owners." Those precise phrases do not appear in our dictionaries, and, consequently, we must parse them. In Webster's Third New International Dictionary (1971) at 1612, an "owner" is defined as "one that has the legal or rightful *title* whether the possessor or not." (emphasis added) A "landowner," then, is defined in *Webster's* at 1269, simply as an "owner of land." The word "surface" means the "exterior or outside of an object or body; * * * situated on the surface of the earth rather than in the air or underground." *Webster's* at 2300.

A more comprehensive definition is found in Black's Law Dictionary (5th ed. 1979). There the word "owner" is defined generally as "[t]he person in whom is vested the ownership, dominion, or *title* of property * * * who * * * has a right to enjoy and do with [the property] as he pleases, even to spoil or destroy it, as far as the law permits * * *." (emphasis added) *Black's* at 996. When it is applied to land, the term "owner" means, according to *Black's* at 996 "one who owns the *fee* and who has the right to dispose of the property." (emphasis added) The term

---

1. The statute ostensibly permits a surface landowner to veto the mining permit, but, in fact, that provision is subject to authority in the EQC to issue an order in lieu of consent, after a hearing. In order to do that, the EQC must find that the permit application meets the requirements of § 35–11–406(b)(xii)(A)–(E), W.S.1977, which provide that the EQC shall issue the order if it finds:

   "(A) That the mining plan and the reclamation plan have been submitted to the surface owner for approval;

   "(B) That the mining plan and the reclamation plan is detailed so as to illustrate the full

proposed surface use including proposed routes of egress and ingress;

   "(C) That the use does not substantially prohibit the operations of the surface owner;

   "(D) The proposed plan reclaims the surface to its approved future use, in segments if circumstances permit, as soon as feasibly possible;

   "(E) For surface coal mining operations, that the applicant has the legal authority to extract coal by surface mining methods." Section 35–11–406(b)(xii)(A)–(E), W.S.1977.

"surface," when invoked in connection with mining, means "that part of the earth or geologic section lying over the minerals in question." *Black's* at 1293.

A composite definition from these dictionary sources can be iterated: a "surface landowner" or "surface owner" is one who has a legal, rightful, or fee title to the exterior or outside of the earth, and who has an inherent right to enjoy or dispose of that property to the extent permitted by law; a "surface landowner" or a "surface owner" is the owner in fee of the surface estate.

In *Black's* at 457, an "easement" is defined as "[a]n interest which one person has in the land of another." The definition ascribes "ownership" of the land to someone other than the person holding the easement. The Supreme Court of Arizona stated the proposition this way:

"* * * The essential qualities of easements as enumerated by all the authorities are: First, they are incorporeal; second, they are imposed upon corporeal property and not upon the owner of it; third, *they confer no right to a participation in the profits arising from such property;* fourth, they are imposed for the benefit of corporeal property; fifth, there must be two distinct tenements, a dominant, to which the right belongs, and a servient, upon which the obligation is imposed." (emphasis added) *Day v. Buckeye Water Conservation and Drainage District,* 28 Ariz. 466, 237 P. 636, 640 (1925), citing 19 C.J. 864.

This court has quoted with approval a definition of an easement as a "liberty, privilege, or advantage in land, without profit, and existing distinct from the ownership of the soil * * *." *Metcalf v. Hart,* 3 Wyo. 514, 27 P. 900, 906 (1891). See also *Potter v. Northern Natural Gas Company,* 201 Kan. 528, 441 P.2d 802 (1968).

Appellant, Belle Fourche, holds only an easement. Analyzing its rights in the light of the definition of principles set forth above, it is clear that Belle Fourche, as the holder of an easement, is not a statutorily-protected "surface landowner" or "surface owner."

A similar distinction between ownership and rights of occupancy is found with respect to leaseholds. A "lease" is defined as "[a]ny agreement which gives rise to the relationship of landlord and tenant." *Black's* at 800, citing *Smith v. Royal Insurance Company,* 111 F.2d 667, 671 (9th Cir.1940), cert. denied 311 U.S. 676, 61 S.Ct. 43, 85 L.Ed. 435 (1940). Fundamental to the relationship of landlord and tenant is the proposition that a lease, while very often granting exclusive possession of the premises to the lessee for the period specified in the lease, does not grant "ownership" of the land to the lessee as that term has been defined. The very nature of a lease encompasses a recognition by the lessee that he does not have an ownership interest in the property. The necessary elements of the relationship of landlord and tenant have been said to be: "[p]ermission or consent on the part of the landlord, subordination to the landlord's title and rights on the part of the tenant, a reversion in the landlord, an estate in the tenant, and the transfer of possession and control of the premises to the tenant under a contract either express or implied between the parties." See *Coggins v. Gregorio,* 97 F.2d 948, 950 (10th Cir.1938). While the landlord and tenant enjoy separate and distinct estates in the leased premises, it is inherent to the relationship that the legal title is in the landlord, and the tenant has only a usufructory interest limited by the term of the lease. *Redgrave v. Schmitz,* 584 S.W. 2d 374 (Tex.1979). A leasehold is an "interest" in real estate, but it is not a freehold. *King v. White,* 499 P.2d 585 (Wyo.1972).

Eighty–Eight is a tenant or lessee in accordance with these definitions. When the elements of the relationship as set forth above, particularly the second one, are applied, it is clear that the lessee is not included within the statutory protections afforded the holders of the fee title in the property. When the definitions of "surface landowner" and "surface owner" are compared to the definitions of an "easement" and a "lease," it is clear, from the language used in the statute, that those terms

do not encompass interests such as easements or leaseholds.

While we could rest this case on the foregoing lexigraphy, the appellants so vigorously urge their position that we also test the result in the context of Wyoming legislative history as influenced by the federal legislative history relating to similar statutes and the traditional concepts of mineral law. Our holding that the holder of an easement or a lease is not intended to be protected by §§ 35–11–406(b)(xii) and 35–11–416, W.S.1977, finds support in the legislative history surrounding the enactment of these statutes and their predecessors in Wyoming, in traditional law relating to mineral interests which antedates the adoption of such statutes and still has influence and impact, in the history of federal legislation surrounding the enactment of the federal counterpart to Wyoming's statute, the SMCRA, and in the subsequent legislative action and inaction relating to these statutes and their interpretation.

We commence this analysis by noting that traditionally in the law the mineral estate was identified as the dominant estate with respect to the ownership of the surface and the incidents of ownership of a mineral estate included certain inherent surface rights. The law long has recognized an initial, irrefutable principle that there must be a legitimate area in which the owner of the minerals of necessity has inherent rights to the surface relating to the opportunity to find and develop minerals. See generally, Haughey and Gallinger, *Legislative Protection of the Surface Owner in the Surface Mining of Coal Reserved by the United States*, 22 Rocky Mtn.Min.L.Inst. 145 (1976). The control of access on the part of the owner of the mineral estate was the imposition of a standard of reasonableness, i.e., the mineral owner or operator is permitted to use only so much of the surface as is reasonably necessary or incident to his finding, developing and producing the minerals. Thompson, *Surface Damages—Claims by Surface Estate Owner Against Mineral Estate Owner*, 14 Wyo.L.J. 99 (1959–60). Under such a rule, the surface owner received no compensation for surface damage so long as the use of the surface by the mineral owner was reasonable but, if the mineral owner was negligent or engaged in wilful misconduct in his use of the surface, damages could be imposed.

With the law in this posture, the early 1900's witnessed the acquisition of public land by private individuals from the federal government. In our state, the acquisition of public land was accomplished under the Act of March 3, 1909, 35 Stat. 844; the Act of June 22, 1910, 36 Stat. 583; the Agricultural Entry Act of 1914;[2] the Stock Raising Homestead Act of 1916;[3] and the Small Tract Act of 1938.[4] With respect to lands acquired under these statutes, the patents to the surface owners encompassed a reservation or severance of all minerals to the federal government. Lacy, *Conflicting Surface Interests: Shotgun Diplomacy Revisited*, 22 Rocky Mtn.Min.L.Inst. 731 (1976). Pursuant to the reservations, the federal government was given the power to grant to other private persons the right to develop the minerals.

The Agricultural Entry Act of 1914 and the Stock Raising Homestead Act of 1916, "enacted to carry out the expressed national policy of conserving the natural resources for future generations,"[5] operated together and permitted the settlement for agricultural and livestock purposes of much of the land throughout the west. The activities primarily pursued by the surface owners were agricultural, and so the acts incorporated protections from the destruction caused by mining activities for lands used for crops and those improvements that had an agricultural purpose. These acts provided for the posting of a

2. Act of July 17, 1914, Ch. 142 § 1, 38 Stat. 509; Act of June 16, 1955, Ch. 145 § 2, 69 Stat. 138, as amended 30 U.S.C. §§ 121–124 (1958).

3. Act of Dec. 29, 1916, Ch. 9, § 1, 39 Stat. 862, as amended 43 U.S.C. §§ 291–301 (1958).

4. Act of June 1, 1938, 52 Stat. 609, as amended 43 U.S.C. § 682a–682e (1958).

5. Twitty, *Law of Subjacent Support and the Right to Totally Destroy Surface Mining Operations*, 6 Rocky Mtn.Min.L.Inst. 497, 514 (1961).

bond or surety to secure payment of all damages to crops or other improvements on the lands. In *Kinney–Coastal Oil Company v. Kieffer,* 277 U.S. 488, 48 S.Ct. 580, 72 L.Ed. 961 (1928), the Supreme Court approved the decision of the District Court for the District of Wyoming, *Kinney–Coastal Oil Company v. Kieffer,* 1 F.2d 795, 797 (D.Wyo.1924), which limited the act by stating:

" * * * The term 'crops' clearly refers to agriculture, and the term 'improvements,' in the connection in which it is found, can reasonably have no other significance than those of an agricultural nature."

We followed this reasoning in *Holbrook v. Continental Oil Company,* 73 Wyo. 321, 278 P.2d 798 (1955).

Subsequently, the federal acts were expanded to include protection for land supporting grazing and cattle interests because of the increase of those activities.[6] Both acts provided, using identical language, that the mineral grantee could "occupy so much of the surface" of land overlying the minerals as was "required for all purposes reasonably incident [or necessary] to the mining." See *Kinney–Coastal,* 277 U.S. at 491, 48 S.Ct. at 581; *Bourdieu v. Seaboard Oil Corporation,* 48 Cal.App.2d 429, 119 P.2d 973 (Cal.1941); Thompson, *Surface Damages—Claims by Surface Estate Owner Against Mineral Estate Owner,* supra. These provisions were consistent with traditional mineral law recognizing the right to use the surface possessed by the owner of a mineral interest. See *Transwestern Pipeline Company v. Kerr–McGee Corporation,* 492 F.2d 878 (10th Cir.1974). The acts adjusted the traditional approach, however, by providing for the posting of a bond or undertaking to be filed with the Secretary of the Interior for payment of damages resulting to the crops and improvements of the owners of the land resulting from the mining operations. See, e.g., Agricultural Entry Act, Act of July

17, 1914, 30 U.S.C. § 121 (1958); Stock Raising Homestead Act, Act of Dec. 29, 1916, 43 U.S.C. § 299 (1958); Haughey & Gallinger, *Legislative Protection of the Surface Owner in the Surface Mining of Coal Reserved by the United States,* supra.

Those acts used interchangeably the terms "surface patentee," "entryman," and "owner of the land." These terms equate to "ownership" of the surface of the land under the acts. In 1934, Congress enacted the Taylor Grazing Act, Act of June 28, 1934, Ch. 865, 48 Stat. 1269, which, although not expressly repealing the prior acts, limited them because most of the remaining unoccupied public land was withdrawn from agricultural entry. See Twitty, *Law of Subjacent Support and the Right to Totally Destroy Surface in Mining Operations,* 6 Rocky Mtn.Min.L.Inst. 497 (1960); and Mall, *Federal Mineral Reservations,* X Land & Water L.Rev. 1 (1975). The impetus for this statute was overgrazing of the public range creating a danger of permanent injury. The Taylor Grazing Act manifested a response to different needs of cattlemen and conservationists from those that had existed prior to that time, and this is evidenced by the stated purpose which was "[t]o stop injury to the public grazing lands by preventing overgrazing and soil deterioration, to provide for their orderly use, improvement and development, to stabilize the livestock industry dependent upon the public range, and for other purposes." With respect to mineral development, the act specifically allowed the mineral owner to "enter and occupy so much of the surface as may be required for all purposes incident to mining and removal of minerals therefrom, and * * * mine and remove such minerals, upon payment to the *owner* of the surface for damages caused to the land and improvements thereon." (emphasis added) Act of June 28, 1934, Ch. 865 § 8, 48 Stat. 1269, 1933–1934. In 1936, this section of the act

---

6. In 1949, Congress passed 30 U.S.C. § 54 which provided that "any person mining by open pit or strip mining methods [would] also be liable, in addition to his liability for damages to crops or improvements of the homesteader, for damages that may be caused to the value of the land for grazing." Brimmer, *The Rancher's Subservient Surface Estate,* V Land & Water L.Rev. 49, 60 (1970). See also Mall, *Federal Mineral Reservations,* X Land & Water L.Rev. 1 (1975).

was amended so that prospecting for minerals became one of the approved activities for which one could enter and use the surface.

These early statutory attempts relating to the surface lands overlying reserved minerals manifest an intent of the Congress to protect primarily the land itself and, secondarily, the owners of that land. The lands which were intended to be protected were those in use as agricultural or grazing lands. During the 1940's to the 1960's, the owners generally used land for the purposes for which it was originally patented but, from that time on, many owners of the surface sold it, divided it, or released full ownership of the surface estate thereby creating various new interests. Then, in the period of the 1960's and 1970's, the energy crisis, coupled with the emphasis on surface mining of western coal, clearly demonstrated a necessity for increased federal and state regulation to protect the environment and those owners of surface lands overlying federally reserved minerals. Lands were mined by strip mining methods without restoration, and once-productive agricultural and grazing lands were destroyed by mining activities. The states responded by enacting their own reclamation legislation intended to curb the destruction of traditional agricultural and grazing lands because of the surface mining methods. The first meaningful attempt in this area in Wyoming was the Open Cut Land Reclamation Act, S.L. of Wyoming 1969, Ch. 192. See Comment, *Regulation of Open Cut Mining in Wyoming*, V Land & Water L.Rev. 449 (1970). The policy of this act was to provide for:

" * * * [T]he reclamation and conservation of land subjected to surface disturbance by open cut mining and thereby to preserve natural resources, to aid in the protection of wildlife and aquatic resources, to establish agricultural, recreational, home and industrial sites, to protect and perpetuate the taxable value of property, and to protect and promote the health, safety and general welfare of the people of this State." S.L. of Wyoming 1969, Ch. 192.

The statute required a permit for a new open cut mine, established obligations of the operator in mining, reclaiming and restoring land, and the submission of a bond to the commissioner of public lands to insure that money would be available to carry out the reclamation. The legislative intent was protection of crops, agricultural improvements, and the value of land for grazing through a reclamation process, and owners were not mentioned in any significant way. This statute was repealed in 1973 because its effectiveness was limited. See R. Austin and P. Borrelli, *The Strip Mining of America*, 8 Sierra Club 1971; and Comment, *Regulation of Open Cut Mining in Wyoming*, supra.

The efforts of the State did not end at that point, however. In 1973, the legislature again addressed the effects of surface mining and enacted the original version of the Wyoming Environmental Quality Act (EQA). Chapter 250, S.L. of Wyoming 1973. The land quality provisions of the EQA established a new permit and licensing scheme designed to insure the adequate reclamation of strip-mined lands. Sections 35–502.20 through 35–502.41, W.S.1957 (Cum.Supp.1973). The statute incorporated many of the requirements of the Open Cut Reclamation Act of 1969, but it provided additional protection for the surface owner of lands proposed to be mined. The applicant for a mining permit had to obtain and include in the reclamation plan the written consent of the surface owner. If that consent were withheld, the Environmental Quality Council, responsible for the administration of the EQA, could hold a hearing and issue an order in lieu of consent based upon finding that the mining operations would not "substantially prohibit the operations of the surface owner." Section 35–502.24(b)(x)(C), W.S.1957 (Cum.Supp.1973). The issuance of a permit depended upon the posting by the applicant of a bond against damages to the surface owner's crops and forage or tangible improvements. This expansion of protection did not in any way manifest a purpose to extend protection to those owners of an interest other than the fee.

The EQA was amended in 1975 primarily, for our purposes, to distinguish a "resident or agricultural land owner" from others with respect to applications filed after March 1, 1975 and from the "surface land owner" protected with respect to permits granted between July 1, 1973 and March 1, 1975. It added with respect to post March 1, 1975 applications another category of "any lands privately owned but not covered by the provisions of W.S. § 35–502.24(b)(xi)," which were to be included within the provision of the statute providing for an order in lieu of consent. This amendment manifested a recognition by the legislature of the new uses to which land was being devoted. The old version of the EQA and earlier models furnished protection for the land owner, but that protection was only for owners who used the lands for agricultural or residential purposes. *Holbrook*, 278 P.2d at 798. After 1975, owners of land that was used for other purposes also were granted protection. The protection was not as complete as that provided for owners using the land for agricultural or residential purposes. Those owners were given an absolute veto to an application while the owners using land for other purposes were granted the right to a hearing if they objected to the proposed mining activities, after which the EQC still could issue an order in lieu of consent. Section 35–502.24(b)(xii)(C), W.S. 1957 (Cum.Supp.1975) Still the protection was limited to owners of land and preferentially to those who lived on the land or relied on it for their livelihood. The effect of all this legislation was to alter the traditional relationship between the dominant mineral estate and the servient surface estate. A residential or agricultural land owner was afforded a dominant position with respect to a mining application because of the absolute veto power. A surface owner who devoted the land to other purposes also enjoyed a dominant position in light of the qualified veto power extended to him. The statute did encompass a bonding requirement, § 35–502.33, W.S. 1957 (Cum.Supp.1975), the purpose of which was to insure that the mining operator would faithfully perform the statutory

requirements, most particularly the restoration of the surface.

In about the same period, the federal government was evolving its own comprehensive mining and reclamation standards. By 1973, several legislative proposals were pending in Congress to either ban altogether or strictly regulate the surface mining of coal. Mall, *Federal Mineral Reservations*, supra. More than thirty years of legislative effort in this area finally took the form of the SMCRA. The SMCRA was the culmination of a congressional attempt to strike a balance between the protection of the environment and the nation's need for coal (30 U.S.C. § 1202), and the policy was to both protect and enhance one of the nation's valuable resources.

The goal of SMCRA was to provide for a "nationwide program to protect society and the environment from the adverse effects of surface coal mining * * *." 30 U.S.C. § 1202. In this statute, Congress promulgated requirements for all surface mining of coal, however it might be owned, as long as the coal entered interstate commerce. The effort of SMCRA, however, was to "assist the States in developing and implementing" programs to achieve the statutory purposes, instead of pre-empting surface mining regulations. 30 U.S.C. § 1202. The several states were invited to maintain control over surface mining of lands within their borders, subject to federal regulations, provided that the state program could not be less stringent in its regulation of land use and environmental controls than SMCRA. 30 U.S.C. § 1255(b). The federal statute created minimum environmental performance standards but maintained for the states discretion to adopt more stringent regulations designed to meet the peculiar needs of the state. In pursuing this lead, Wyoming adopted one of the more restrictive programs in the country in the EQA.

The federal-state partnership of regulation was implemented through 30 C.F.R. § 211.77 (1977), providing for cooperative agreements between federal and state governments with respect to reclamation on federal lands. The agreement relating

to the State of Wyoming clearly articulated the purpose which was to "prevent duality of administration and enforcement of surface reclamation requirements by designating the State of Wyoming as the principal entity to enforce reclamation laws and regulations in Wyoming." 30 C.F.R. § 211.77, Art. I (1977). There can be no question that Wyoming implemented the policy of the SMCRA.

One of the most debated provisions of the SMCRA was that relating to surface owner consent. 30 U.S.C. § 1260(b)(6). That section requires that a permit shall not be issued unless the mining applicant submits either the written consent of the surface owner or an instrument demonstrating a conveyance expressly granting to the mineral operator the right to conduct surface mining. Even though this provision is included in the SMCRA, surface owner consent was not one of the provisions specifically required to be included in a state program.

Drafts of the federal bills and proposals were available to the legislature of the State of Wyoming when it debated the EQA, even though the SMCRA was passed after the original version of the Wyoming statute. This clearly is indicated by almost identical language in certain key provisions. The SMCRA recognized that reclamation requirements of Wyoming found in the EQA afforded general protection of the environment at least as stringent as would occur under the SMCRA. 30 C.F.R. § 211.77, Art. III.A (1977). Wyoming went even further than the SMCRA in its effort to provide more specific protection of the surface owner by imposing an absolute or qualified requirement for surface owner consent prior to the commencement of mining operations. See Haughey and Gallinger, *Legislative Protection of the Surface Owner in the Surface Mining of Coal Reserved by the United States*, supra.

It is significant, in light of the parallel purpose of the two statutes, that under the SMCRA "surface owner" was narrowly defined to include only persons who either lived on the property or conducted farming or ranching operations there. This defini-tion is compatible with the Wyoming EQA definition of "surface owner" contained in § 35–11–406(b), W.S.1977. The consent of a surface owner who is a residential or agricultural landowner and has owned land since January 1, 1970 is absolutely necessary for the issuance of a mining permit. Section 35–11–406(b)(xi), W.S.1977. The requirement is less absolute with respect to all other surface land owners, but the proviso still only reaches to "owners" of the land. Section 35–11–406(b)(xii), W.S.1977.

■ Given this history of compatible federal and state legislative efforts, it is not surprising that the DEQ, the administrative agency charged with enforcement of the EQA, has consistently used a narrow definition of the ownership concept. Over the years, the DEQ has maintained a long-standing interpretation in connection with the administration of the statutes and rules and regulations pertaining to mining permits that holders of easements and leases are not entitled to the protections contained in the consent and bonding provisions of the statute. Our rule is that "[t]he construction of a statute by an agency charged with its execution is entitled to consideration in the case in which the application and construction is an issue for the courts." *WYMO Fuels, Inc. v. Edwards*, 723 P.2d 1230, 1237 (Wyo.1986) (citing *Demos v. Board of County Commissioners of Natrona County*, 571 P.2d 980 (Wyo.1977)). Further, in analyzing the construction of the statute by administrative authorities "contemporaneous construction over a period of years, unless clearly erroneous, must be given weight." *School Districts, Campbell County*, 424 P.2d at 758. The interpretation that holders of easements and lessees are not surface owners is entitled to great weight and deference.

Our analysis of the legislative history is consistent with our interpretation of these terms under the clear language of the statute. If the position of the appellants that "owners of surface rights" are "surface owners" or "surface land owners" were to be sustained, the development of surface coal mines in Wyoming would indeed be limited. If all "owners of surface rights"

were extended the protections afforded the surface owner or surface land owner, then owners of insignificant rights to the surface would be able to veto surface coal mine development, or worse, they would have the means of extortion at hand.

■ We cannot believe that the legislature intended that result. It seems clear that the purpose of these statutes was not to hinder development of the surface mining, but rather to permit such development while protecting the surface of the land itself. It is clear from the evolution of the several statutes which have addressed the matter that the legislature intended to extend protection to the surface of the land through a narrowly defined class of owners, but it did not intend to protect the interest of every conceivable possessor of some right to the surface.

■ We hold that the statutory protections encompassed in §§ 35–11–406(b)(xii) and 35–11–416, W.S.1977, were intended to be available only to the fee owner of the surface estate. The holders of other lesser interests constituting less than fee ownership, including holders of easements and lessees, are not protected by the consent and bonding provisions of the EQA. Thus, it was not necessary for Thunder Basin to obtain the consent of the appellants to its proposed mining and reclamation plan nor to post a bond to insure compensation for damages resulting in any injury to their interests. Thunder Basin complied with all the requirements of the EQA in its mining application, particularly with respect to obtaining the necessary surface owner consents and posting bond to insure reclamation of the surface of the mined lands. In light of this compliance, the decision of the DEQ to issue a permit and license to mine to Thunder Basin was proper. We do not reach the question of whether, at some point, the appellants might be entitled to damages under the law. See Thompson, *Surface Damages—Claims by Surface Estate Owner,* supra.

■ The next contention of the appellants is that this case must be remanded because the EQC failed to address the claim that Ch. IV, § 3.k. is unlawful. The pertinent statute provides that in reviewing administrative actions, "due account shall be taken of the rule of prejudicial error." Section 16–3–114(c), W.S.1977, specifically states:

"To the extent necessary to make a decision and when presented, *the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.* In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error." (emphasis added)

It would serve no purpose to remand this issue to the EQC for its determination. The main issue presented by the appellants is the interpretation of a state statute, § 35–11–406(b)(xiii), and the meaning or applicability of an administrative ruling, Ch. IV, § 3.k., which appellants perceive to be impermissible in light of the statute. This question is clearly within the province of the court because it involves only a question of law for the court to decide. Section 16–3–114(c), W.S.1977.

■ We then reach the final issue presented by the appellants which is that Ch. IV, § 3.k. is unlawful. The rule in question provides:

"Section 3. *Special environmental protection performance standards applicable to surface coal mining and reclamation operations.* In addition to those performance standards contained in the Act and Section 2 of this Chapter, the following performance standards shall be applicable to all surface coal mining and reclamation operations:

\*　　\*　　\*　　\*　　\*　　\*

"k. \* \* \* All operations shall be conducted so as to *minimize* disruption of any services provided by facilities located on, under or through the permit area, unless otherwise approved by the administrator or owner of such facilities." (emphasis added)

The appellants contend that this rule is invalid because it does not meet what they perceive as a stringent requirement of § 35–11–406(b)(xiii), W.S.1977. They see

that requirement in the statute as one which demands the applicant include in its mining and reclamation plan "[t]he procedures proposed to *avoid* * * * endangering * * * property * * * in or adjacent to the permit area * * *." (emphasis added) The appellee points out correctly that the appellants gloss over the difference between the statute and the rule. The reach of the statute is to property located in or adjacent to the permit area, while the rule applies to services provided by facilities in that area. The two provisions are not inconsistent because they address different topics. As such, they can co-exist, and the application of the rule does not displace the application of the statute.

It would appear that the rule affords greater protection to owners of facilities offering services in the area, such as those owned by the appellants, than does the statute. The rule is not less stringent than the statute, as the appellants argue, but appears to be more stringent because it requires the applicant for a mining permit to do more than the statute requires. If we were to declare this rule invalid, which is what the appellants urge, that would take away a protection not otherwise granted under the statute to owners of interests in service facilities in the permit area. That surely is not the result which the appellants would choose and, of course, it is apparent that the validity of their contention depends upon the acceptance of their earlier claim to be "surface owners" or "surface land owners."

Furthermore, there really is no difference between "avoidance," as used in the statute, and "minimization," as used in the rule. As a practical matter, the words intend the same result. The statute does not contemplate a situation in which a coal company would be required to mine around existing property within the mine permit area, nor does the rule. Whether the standard is to avoid or minimize is irrelevant when the property is in the path of a surface mining operation permitted under the statute, because in either instance the property must be moved. Any difference is inconsequential when applied to property in the path of the surface mining operation, because the legislature did not intend that

such property be preserved from interference by the mining operations. Rather, as was the rule at common law, the use of such property is to be reasonable in light of the intended mining, and the property is not entitled to preservation. At most the owners will be compensated.

The Wyoming legislature intended to establish a flexible system compatible with minimum federal standards and thereby retain state control over reclamation of surface-mined areas. The delegation to the administrative agency of the development of substantive reclamation standards in rules and regulations is consistent with that intention and reaches the desired result. The system does not require that the holder of an easement or a ninety-nine year lease is to be treated as a "surface owner" or a "surface land owner" for purposes of the statute. The owners of such interests cannot foreclose mining development, but they may claim compensation for any taking of surface improvements in the process of mining. Destruction of improvements owned by the surface owner was never perceived as a reasonable use of the property by the owner of the minerals.

The decision of the administrative agency, the Department of Environmental Quality, is affirmed.