BRUCE v. OHIO OIL CO. et al.
No. 3606.

Circuit Court of Appeals
Tenth Circuit.

July 15, 1948.

Rehearing Denied Sept. 30, 1948.

---

[7] Washington v. Colvin, 55 Okl. 774, 155 P. 251, 252.

[8] 28 U.S.C.A. § 111; Camp v. Gress, 250 U.S. 308, 316, 317, 39 S.Ct. 478, 63 L. Ed. 997.

710

J. B. Dudley, of Oklahoma City, Okl., and Owen Vaughn of Chickasha, Okl., for appellant.

J. H. Jarman, of Oklahoma City, Okl., and H. G. Ross, of Tulsa, Okl., for appellees.

Before BRATTON, HUXMAN and MURRAH, Circuit Judges.

HUXMAN, Circuit Judge.

This was an action brought by the appellant[1] against the Ohio Oil Company and Ramsey Petroleum Corporation[2] seeking an accounting of gas produced from land belonging to Bruce. It arose from the following facts.

Bruce, as owner, together with her husband, now deceased, executed an oil and gas lease to the English Drilling Production Company covering the Southwest Quarter (SW¼) of the Northeast Quarter (NE¼) of Section Eleven (11), Township Five (5) North, Range Nine (9) West, Caddo County, Oklahoma, containing forty (40) acres, more or less. By assignment, the lease on this land, with the exception of the Northeast Quarter (NE¼) thereof (10 acres), became the property of the companies. The lease had been released as to the Northeast ten acres; wells had been drilled on land adjoining the thirty acres, and Bruce claimed these wells drained oil and gas from her land. She instituted an action against the companies for damages on account of the alleged drainage. This suit was settled by agreement of the parties. The settlement was evidenced by a letter in the form of a letter contract. The settlement, in substance, provided that Bruce would execute and deliver to the companies an oil and gas lease to the ten acres not covered by the original lease, covering only all sands below the Wade Sand; that Bruce was to receive a cash payment of $12,500, and a further sum of $12,500, payable only from

---

[1] Herein referred to as Bruce.  [2] Herein referred to as the companies.

one-eighth of the seven-eighths of the oil and gas produced from the sands below the Wade Sand from the ten acres, or from such production as was allocated to the ten acres. The lease to the ten acres provided that a well drilled on any part of the forty-acre tract should satisfy the requirements thereof for the drilling of a well.

At the time the lease and letter contract were executed, the First War Powers Act, 1941, 50 U.S.C.A.Appendix § 601 et seq., and Regulations promulgated thereunder regulated the use of critical materials in the drilling of oil and gas wells. So far as material these regulations provided that such materials could not be used in connection with a gas well drilled on a tract of less than 640 acres, except with a permit from the Petroleum Administrator for War. The parties recognized the necessity of obtaining such a permit and also that it might be necessary to combine this acreage with other acreage in order to obtain permission to use critical materials necessary to equip and operate such a well.[3]

Upon application by the company, an order was obtained from the Administrator authorizing the drilling of a gas well on Bruce's forty-acre tract. When this well came in, an application for the use of critical material was made by the company to permit the completion of this well for the production of gas. The application included the forty-acre tract owned by Bruce and an adjoining forty-acre tract known as the Lackey tract. The application stated that, "In order therefore that the correlative rights are protected, both as to royalty owners and lessees, it is necessary that gas wells be allowed to produce on less than the prescribed 640 acres."

The permit of June 29, 1945, authorizing the use of critical material, provided for the production of gas " * * * in the manner proposed, provided that all the property interests in the eighty-acre tracts upon which each well is located,[4] as designated on the plat submitted with the application, are consolidated and assigned to that well." The effect of this permit was to allow the equipment and operation of one well for the two forty-acre tracts and consolidated Bruce's tract with the Lackey tract.

---

[3] The letter contract provided that:

A. "Upon the execution and delivery of said oil and gas lease by you, as provided above, Ramsey Petroleum Corporation and The Ohio Oil Company shall immediately begin to use their best efforts to obtain a permit from the Petroleum Administrator for War to drill a well on some part of said SW¼ of NE¼ of Section 11-5N-9W, prospecting for oil below the Wade sand, and agree to commence operations for the drilling of said well within six months from the date they shall have obtained from the Petroleum Administrator for War a permit to drill said well.

B. " * * * the lessor shall be entitled to receive out of, and only out of, ⅛ of ⅞ths of the oil or gas from all sands only below the Wade Sand that may be produced from or allocated to said ten acres as being produced from said ten acres (NE¼ SE¼ NE¼ of Section 11-5N-9W), as a part of the SW¼ of NE¼ of Section 11-5N-9W, when unitized, or any other unitized area that may be necessary in order to drill or produce oil or gas from the lands in the area in which said ten acres is located, under State or Federal laws, rules and regulations * * *.

C. "That in the event the drilling of the above mentioned proposed well below the Wade Sand should result in a gas well that you will join in any unitization agreement that may be necessary to be executed by the royalty owners in order to unitize the required number of acres or area from which gas may be produced and marketed by the authority that may be required to be obtained from the U. S. Petroleum Administrator for War, or any other State or Federal authority for the production of gas from said well."

The lease for the ten-acre tract also contained the identical provision as set out above in footnote 3B. It also contained this further provision: "All express or implied covenants of this lease shall be subject to all Federal and State Laws, Executive Orders, Rules or Regulations, and this lease shall not be terminated, in whole or in part, nor lessee held liable in damages for failure to comply therewith, if compliance is prevented by, or if such failure is the result of, any such Law, Order, Rule or Regulation."

[4] The application had sought permission to operate and produce two different wells. The other gas well is not involved in this controversy.

■ It is first contended that the company violated its contractural obligation to Bruce by making an application for the drilling of one gas well on the combined Bruce and Lackey acreage. It is urged that the application, in the first instance, should have been confined to the Bruce forty without any unitization with other acreage. The trial court found that it would have been useless to have sought permission to equip and operate a gas well on the Bruce forty acres alone. We agree with this finding of the trial court. It is not necessary to elaborate our reasons for approving this finding by the trial court. We think it is sufficient to say that under the conditions due to the war, the regulations promulgated for the conservation of critical war material and under the contracts between the parties, such an application would, as the trial court found, have been unavailing.

■ The main point upon which appellant relies for reversal is that neither in the letter contract nor in the lease did she agree to or consent to the unitization of her royalty interest with any adjoining acreage, and that all she agreed to was a unitization of her ⅛ in the ⅞ths of the production allocated to the ten-acre tract until she had received the additional $12,500 from production. In other words, she claims a right to receive, as a royalty holder, a full ⅛ of the entire production from the one well. This position is not well taken.

■ There is no conflict or disagreement between the parties as to the principles of law which control. Thus, it is clear that the leaseholders of two separate tracts may unitize their working interests in their leases without the consent of the royalty holders. It also follows that in the absence of consent by the royalty holders, their interests are not bound by such unitization agreements. In the end, the question is one of ascertaining the understanding and intent of the parties as contained in their written agreements. When considered in the light of the surrounding facts, conditions and circumstances, we find no difficulty in concluding that Bruce, by the letter contract and the executed lease, consented to a unitization of all of her interests in her forty-acre tract with any other tract necessary in order to obtain a permit for the use of critical war materials to enable the equipment and operation of the well.

It is argued that the "property interests", which the order of June 29, 1945, required to be consolidated and assigned to the well, relates to the working interests under the leases on the two tracts and does not cover the regular royalty interests of the eighty-acre unit, and that, therefore, Bruce's regular royalty interest was not affected by the order of the P. A. W. Administrator.

■ This may be conceded for the purpose of this opinion, but it does not answer our question. The question is not what the regulations contemplated by the phrase "property interests", but is what construction is to be placed upon the letter contract and the lease in question between the parties to this litigation. The language of the contract is that Bruce "will join in any unitization agreement that may be necessary to be executed by the royalty owners in order to unitize the required number of acres or area from which gas may be produced and marketed by the authority that may be required to be obtained from the U. S. Petroleum Administrator for War * * *" Of course, all that the order did was to fix the area necessary for permission to drill one well or to equip one well with war scarce material. In this case, the Administrator fixed this area at eighty acres. By her agreement, Bruce agreed to join as a royalty holder in any agreement necessary to operate this acreage as a unit. It is beside the point to say that the lessor's interest in the eighty-acre tract could be unitized without consent of the royalty holders. Common knowledge tells us that the purpose of the unitization of two separately owned tracts is to permit the drilling of a single well and yet preserve to all interested parties their property rights in their respective tracts. If the holder of two leases on two separately owned tracts would unitize them without the consent of the royalty holders, and drill a single well upon one of the tracts and produce all of the gas under the combined acreage through this one well, the

royalty holders of the tract on which the well was located would receive all of the royalty interest in the entire production and the operator would become liable for an additional amount to the royalty holders under the other tract. The consent of the royalty holders of the Bruce tract to its unitization with the Lackey tract was necessary to prevent this and to permit the operation of the two leases as a unit.

The agreements of the parties did not contemplate that in the event Bruce's acreage was unitized with other acreage by the drilling of a single well, that the operator would pay to her a full one-eighth of the production of the combined acreage, and in addition thereto, be required to pay a like amount to the royalty holders of the Lackey tract for their proper share of the gas which was drained from their land through the well located on the Bruce land. The fair and reasonable construction of· the letter contract and the lease is that Bruce, as a royalty holder, agreed to join in the unitization of the acreage designated by the Administrator for a single well so that the tract could then be operated as a unit without detriment or loss to any of the interested parties.

Affirmed.