W.A. MONCRIEF, Jr.; Richard W. Moncrief and Charles B. Moncrief, Independent Executors of the Estate of W.A. Moncrief, deceased, Appellants (Defendants),

v.

M.J. HARVEY, Jr., Appellee (Plaintiff).

M.J. HARVEY, Jr., Appellant (Plaintiff),

v.

TEXACO INC., Appellee (Defendant).

TEXACO INC., Appellant (Defendant),

v.

M.J. HARVEY, Jr., Appellee (Plaintiff).

M.J. HARVEY, Jr., Appellant (Plaintiff),

v.

W.A. MONCRIEF, Jr.; Richard W. Moncrief and Charles B. Moncrief, Independent Executors of the Estate of W.A. Moncrief, deceased; and Texaco Inc., Appellees (Defendants).

Nos. 90–122 to 90–125.

Supreme Court of Wyoming.

July 18, 1991.

Rehearing Denied Sept. 9, 1991.

Morris R. Massey of Brown & Drew, Casper, for W.A. Moncrief, Jr., Richard W. Moncrief, Charles B. Moncrief.

Robert Jerry Hand of Hand & Hand, Casper, Richard V. Gose, Las Cruces, N.M., Thomas J. Nance, David S. Steefel and Richard G. Wilkins of Holme Roberts & Owen, Denver, Colo., for M.J. Harvey, Jr.

Houston G. Williams of Williams, Porter, Day & Neville, Casper, and Marvin G. Twenhafel, Texaco Inc., Denver, Colo., for Texaco Inc.

Before URBIGKIT, C.J., and THOMAS, CARDINE, and MACY, JJ., and ROONEY, J. (Retired).

CARDINE, Justice.

This consolidated case of four appeals presents questions concerning the amount of liability for overriding royalty proceeds from a gas well in the Tepee Flats Unit, Natrona County, Wyoming. A series of summary judgment orders were entered in favor of M.J. Harvey, Jr. (Harvey) by the district court. In case number 90–122, the Moncrief executors (Moncriefs) appeal from the trial court's order determining royalty proceeds, statutory interest, and attorney fees. In case number 90–123, Harvey appeals an order favorable to Texaco upon joint and several liability and the application of proceeds to principal and interest due. In case 90–124, Texaco appeals from summary judgment entered against it. Case 90–125 is a cross-appeal by Harvey.

We affirm in part and reverse in part.

Moncriefs raise the following issues:

"1. Did the District Court err in holding that commitment of the leased lands to the Tepee Flats Unit Agreement as authorized by Section 3(c) of the lease was ineffective to subject Harvey's overriding royalty interest in the leased lands to the unit agreement?

"2. Are the provisions of W.S. §§ 30–5–301 *et seq.* applicable to a dispute over the amount of production proceeds payable as distinguished from a dispute over who should receive the proceeds?

"3. Is the District Court's determination that attorneys' fees aggregating $259,996.22 are reasonable in amount properly supported?"

M.J. Harvey, in his appeal, raises the following additional issues:

"1. Is Defendant Texaco jointly and severally liable to Harvey for the entire amount of the 5% overriding royalty interest owned by Harvey (the '5% Override')?

"2. Does Wyo.Stat. §§ 30–5–301 to –305 (1977) (the 'Royalty Payment Act') apply to Defendant Texaco so that Harvey is entitled to recover from Defendant Texaco penalty interest thereunder, together with all court costs and reasonable attorneys' fees incurred by Harvey in these proceedings?

"3. Should any partial payments that have been made by Defendants to Harvey be applied first to accrued interest due on the unpaid principal balance of the debt, and second to the unpaid principal balance itself, in accordance with the well-established 'United States' rule, or be applied in some other manner?

"4. Does penalty interest at the rate of 18% per year, under Section 30–5–303(a) of the Royalty Payment Act, commence to accrue on June 1, 1982, the effective date of the Royalty Payment Act, or six months thereafter?"

Texaco joins in Moncriefs' first issue, and raises the following additional issue:

"Is the judgment of the District Court contrary to the Wyoming Oil and Gas Conservation statutes?"

The issues raised in Harvey's cross-appeal, case number 90–125, are encompassed by the issues mentioned above and need not be mentioned separately.

On January 7, 1970, the State of Wyoming executed oil and gas lease number 70–806 to Judith Walker of Dallas, Texas covering the following described property:

SE ¼ SE ¼ of Section 8;

S ½ SW ¼ of Section 9;

N ½ and N ½ of the SW ¼ of Section 16;

NE ¼ NE ¼ of Section 17

all located in Township 37 N., Range 86 W. of the 6th P.M., Natrona County, Wyoming (hereinafter called the Harvey lease). The State reserved to itself a one-eighth, or 12½ percent, royalty. Judith Walker assigned the lease on January 29, 1970, to M.J. Harvey, Jr. Harvey assigned the lease to Texaco on November 1, 1976, reserving to himself a five percent overriding royalty interest.

After acquiring the Harvey lease and other oil and gas leases in the vicinity, Texaco formed the Tepee Flats Unit. All owners of interests in the unit area were invited to join the unit, including Harvey. Harvey refused to join the unit.

The State of Wyoming joined the unit by instrument entitled "Approval–Certification–Determination" dated December 6, 1979. This instrument provided

"[t]hat the said unit agreement shall become effective only as to those state lands now or hereafter included within the limits of the unit area and as to which the respective lessees and the then approved working and royalty interests shall subscribe to said agreement."

On September 11, 1979, Texaco and W.A. Moncrief entered into a Farmout Agreement which included the Harvey lease and other leases held by Texaco. The agreement required Moncriefs to commence the actual drilling of a test well within section 16 on or before December 30, 1979. (The unitization agreement for the Tepee Flats Unit required the drilling of a test well within six months of its effective date.) Upon diligent completion of the well, Texaco was to assign to Moncriefs 100 percent of its interest in the subject lease within the initial participating area, 50 percent of

the remainder of the subject lease outside of the initial participating area, and 50 percent of the remainder of the Harvey lease lands and other leases Texaco owned. Moncriefs were to reassign 50 percent of the working interest in the drill site tract to Texaco on payout of the test well.

The Tepee Flats 16–1 well was completed in section 16 on January 13, 1981. Texaco assigned the portion of the lease located in section 16 to the W.A. Moncrief on July 8, 1982. This assignment was expressly made subject to Harvey's previously reserved overriding royalty interest. By another assignment dated July 8, 1982, Texaco assigned 50 percent of the remainder of the Harvey lease lands to Moncriefs. The well produced until December 1985, when it was shut in.

By a decision dated June 29, 1982, the USGS established a participating area of 1,440 acres for the 16–1 well. This area included the lands covered by the Harvey lease. The State took an administrative appeal from the USGS order.

The State of Wyoming and Harvey next filed suit in state district court claiming that they were entitled to 12.5 percent and five percent, respectively, of all production of the 16–1 well, rather than to the share of production allocated to the Harvey lease lands under the unitization agreement. The State and Harvey argued that the Tepee Flats Unit Agreement was not effective as to the Harvey lease lands because Harvey never signed the unit agreement.

Moncriefs and Texaco successfully petitioned for removal of the case to federal district court. The State settled its claims with Moncriefs in April of 1986. The State withdrew its administrative appeal, and this case was remanded to state court for determination of the remainder of the issues.

By decision letter filed December 4, 1989, the trial court granted summary judgment in favor of Harvey, holding that his interest had not been committed to the Tepee Flats Unit Agreement. In subsequent proceedings, the court held that Harvey was entitled to receive from Moncriefs five percent of all proceeds from the sale of all oil and gas from the well since first production. The court also ordered Moncriefs to pay Harvey interest on wrongfully withheld proceeds at 18 percent per annum commencing six months from the time that the Royalty Payment Act, W.S. 30–5–301, *et seq.*, became operative and at seven percent per annum prior to that time since the date of first production.

The parties stipulated to the amount of production from the well, the sales credited to Texaco and Moncriefs, and the payments by Moncriefs to Harvey. On April 2, 1990, the court entered judgment against Moncriefs in favor of Harvey in the amount of $1,462,117.79, of which $641,545.89 represented the principal amount due and $820,571.90 represented accrued interest. The court entered a separate order of summary judgment against Texaco for the difference in royalties paid to Harvey on behalf of Texaco after April 1985 and five percent of the proceeds of the 16–1 well credited to Texaco since that time, plus interest thereon of seven percent. The parties stipulated to the calculation of principal and interest due Harvey from Texaco. The judgment against Texaco was in the amount of $26,266.90, representing principal of $20,393.90 and interest of $5,873.00. The judgment against Moncriefs provided that any payment of the judgment against Texaco would reduce the amount owed by Moncriefs.

The court rejected the "United States rule" requiring application of sums paid first to interest and then to principal. After a hearing on attorney fees, the court ordered Moncriefs to pay Harvey's attorney fees in the amount of $259,996.22, together with court costs of $25.

(A note on nomenclature: W.A. Moncrief died during the pendency of this litigation. W.A. Moncrief, Jr., Richard W. Moncrief, and Charles B. Moncrief are the independent executors of his estate and present parties to this appeal. For simplicity's sake, where action in this litigation was undertaken by either W.A. Moncrief or his executors, we have referred to them as "Moncriefs." With regard to prelitigation

documents signed by W.A. Moncrief, we referred to him by name as an individual.)

With the exception of the issue of the amount of attorney fees to be awarded to Harvey, all the issues in this case were decided as matters of law on motions for summary judgment. With the stated exception, we find that there are no genuine issues of material fact and that the issues presented for determination concern only questions of law.

When reviewing the trial court's grant of summary judgment, we examine the case in the same manner as the trial court, treating the motion as though originally before this court and using the identical material and information which was presented to the trial court. *Baldwin v. Dube*, 751 P.2d 388, 390 (Wyo.1988). The task of this court is identical to that of the trial court and requires a dual finding that there was no genuine issue of material fact and that the prevailing party was entitled to judgment as a matter of law. *Schepps v. Howe*, 665 P.2d 504, 506 (Wyo.1983). When considering questions of law, we accord no special deference to, and are not bound by, the district court's decision. *Matter of North Laramie Land Co.*, 605 P.2d 367, 373 (Wyo.1980).

*Harvey's Interest and the Unit Agreement*

The Tepee Flats Unit Agreement is a unitization plan under the Mineral Leasing Act, 30 U.S.C. §§ 181, *et seq.* This Act, which authorizes federal lessees and their representatives to formulate a unit plan for development of an oil and gas pool or field, provides:

"For the purpose of more properly conserving the natural resources of any oil or gas pool, field, or like area, or any part thereof * * *, lessees thereof and their representatives may unite with each other, or jointly or separately with others, in collectively adopting and operating under a cooperative or unit plan of development or operation of such pool, field, or like area, or any part thereof, whenever determined and certified by the Secretary of the Interior to be neces-

sary or advisable in the public interest." 30 U.S.C. § 226(m) (1988).

The State of Wyoming, by its Board of Land Commissioners, may join state leases in unit plans under the Mineral Leasing Act pursuant to W.S. 36-6-101(d) (Cum.Supp. 1990), which provides in pertinent part:

"The board, on behalf of the state, and its lessee or lessees in any such mineral lease are hereby further authorized to join, in the interest of conservation and greater ultimate recovery of oil and gas, in fair and equitable cooperative or unit plans of development or operation of oil and gas pools, with the United States government and its lessees * * *."

The producing well involved in this case was drilled pursuant to a voluntary unitization agreement. Where the unitization agreements are voluntary, it is strictly up to the interest holders whether they execute or refuse to execute and join the unit agreements. A lessee is without authority to unitize the royalty interest with other interests without consent of the interest owner. 1 Myers, *Law of Pooling and Unitization: Voluntary–Compulsory* § 14.03 at 498 (2nd ed. 1967). It is undisputed that Harvey did not sign the voluntary unit agreement in this case. He specifically refused to sign a Ratification, Consent and Joinder to the unit agreement. When mailed a royalty check by W.A. Moncrief, he accepted it only in partial payment of his full five percent royalty interest and demanded the balance due, with interest. Thus, Harvey's interest was not committed to the unit agreement, unless in some way without Harvey's express consent.

Moncriefs claim that Harvey gave his consent to unitization by the language in the state lease under which he obtained his interest. If this is so, assent to the unit agreement itself was not necessary. *Bruce v. Ohio Oil Co.*, 169 F.2d 709, 713 (10th Cir.1948), *cert. denied* 336 U.S. 913, 69 S.Ct. 604, 93 L.Ed. 1077 (1949). The relevant portion of the state lease reads as follows:

"Section 3. The lessor [State of Wyoming] expressly reserves:

* * * * * *

"(c) The right, *with consent of the lessee*, to commit the herein leased lands in a unit or co-operative plan of development, and to establish, alter, change or revoke the drilling, producing, and royalty requirements of the lease to conform therewith." (emphasis added)

The question presented is whether, by the phrase "consent of the lessee," the State bound itself to obtain consent to unitization from a lessee who assigned the lease but retained an overriding royalty interest.

■ An oil and gas lease is a contract, and we interpret it using the doctrines applicable to contracts. *State v. Moncrief*, 720 P.2d 470, 473 (Wyo.1986). Our basic purpose in construing or interpreting a contract is to determine the intention and understanding of the parties. *True Oil Co. v. Sinclair Oil Corp.*, 771 P.2d 781, 790 (Wyo.1989). If a contract is in writing and the language is clear and unambiguous, the intention of the parties is found in the words of the contract. *Id.* If the contract is ambiguous, resort may be had to extrinsic evidence. *Id.* Whether ambiguity exists is a question of law. *Id.* In this case, the lease is clear and unambiguous. When the phrase "consent of lessee" is applied to a lessee who assigns the lease but retains an interest, the intent of the parties can be ascertained from language used in the lease and established as a matter of law.

■ Commitment of a tract to unitization obviously involves a calculated weighing of the benefits and detriments involved in unitizing the subject lands. The parties may have had in mind the risks lessee faced by agreeing to unitize its interest or refusing to do so. *Cf., Superior Oil Co. v. Roberts*, 398 S.W.2d 276, 277–78 (Tex.1966); *California Co. v. Britt*, 247 Miss. 718, 154 So.2d 144, 148 (1963). The clause provides lessee a voice in assuming (or not assuming) the risks of unitization. Thus, it is held that an assignor who retains an overriding royalty interest is also entitled to the protection afforded by the express or implied covenants of the lease. *See e.g., Wes-Tex Land Co. v. Simmons*, 566 S.W.2d 719, 721 (Tex.Civ.App.1978); *Gould v. Schla-*chter, 443 S.W.2d 764, 765 (Tex.Civ.App. 1969); *Childress v. Siler*, 272 S.W.2d 417, 420 (Tex.Civ.App.1954). Harvey did not surrender this protection by becoming an assignor.

■ We conclude that the word "lessee" as used in the unitization clause was intended to cover lessee/assignors who retain an interest in the lease. A lessee/assignor who retains an interest is subject to many of the same risks as the assignee if the leasehold is unitized without his consent. He is entitled to protection of his interest under existing case law. We hold that the unitization clause could not unitize Harvey's overriding royalty interest without his consent, and his consent was never given.

■ Next presented is the status of the State's attempted unitization of its interests in the Tepee Flats Agreement. Is the State's attempt to join the Harvey lease lands in the unit void because Harvey did not consent? The answer lies in the nature of voluntary unitization. Initially the State asserted a claim that it had improperly joined the unit agreement without Harvey's consent. The State then abandoned that claim and makes no such argument now. Since the State, Texaco and Moncriefs now all consent to joining the unit agreement, their interests were committed voluntarily. Harvey is not prejudiced by having the State remain part of the unit, so long as he receives payment in the full amount of his interest. There being no prejudice to Harvey, there is no reason to disturb the State's commitment to the unit agreement or that of the other parties.

■ Harvey did not consent to unitization of his five percent overriding royalty interest, either by signing the unitization agreement or by the terms of the original lease. Since well 16–1 is located on a leasehold on which Harvey has a five percent overriding royalty interest, and since Harvey's interest was not made subject to unitization by his consent in either the lease or the unitization agreement, Harvey is entitled to a full five percent share of production from the well. We uphold the trial

court's entry of summary judgment on this issue and on the issue of the amount of unpaid royalties due from Moncriefs.

*The Oil and Gas Conservation Statute*

■ Texaco argues that holding for Harvey in this case violates the conservation policy of the State of Wyoming and specifically contravenes the policies inherent in the Wyoming Oil and Gas Conservation Statute, W.S. 30–5–101, *et seq.* Our holding, however, does not deunitize the lands involved or violate conservation policy. It merely awards Harvey his full royalty interest.

The unit agreement involved here is voluntary. Voluntary unit agreements are not per se wasteful simply because they require the consent of interest owners. Moncriefs could have sought forcible pooling in this instance under W.S. 30–5–110(c) but did not elect to do so. They are bound by that choice.

*Interest on Production Proceeds*

The parties raise various issues concerning the applicability of the penalty interest provisions of the Royalty Payment Act, W.S. 30–5–301, *et seq.* This section considers the applicability of these provisions to Moncriefs while postponing our discussion of their applicability to Texaco.

The two issues presented are: (1) whether the Royalty Payment Act applies to Moncriefs in this situation; and (2) if so, from what date should interest be calculated. The Act, which took effect on June 1, 1982, reads in pertinent part as follows:

"30–5–301. *Payment for production; time for payment; payor.*

"(a) The proceeds derived from the sale of production from any well producing oil, gas or related hydrocarbons in the state of Wyoming shall be paid to all persons legally entitled thereto, except as hereinafter provided, commencing not later than six (6) months after the first day of the month following the date of first sale and thereafter not later than sixty (60) days after the end of the calendar month within which subsequent production is sold, unless other periods or

arrangements for the first and subsequent payments are provided for in a valid contract with the person or persons entitled to such proceeds. Payment shall be made directly to the person or persons entitled thereto by the lessee or operator or by any party who assumes such payment obligation under any legal arrangement."

"30–5–302. *Same; interest on late payments.*

"Any delay in determining any person legally entitled to an interest in the proceeds from production shall not affect payments to all other persons entitled to payment. In instances where payment cannot be made for any reason within the time limits specified in W.S. 30–5–301(a), the lessee or operator, purchaser or other party legally responsible for payment shall deposit all proceeds credited to the eventual interest owner to an escrow account in a federally insured bank or savings and loan institution in Wyoming * * * which deposit shall earn interest at the highest rate being offered by that institution for the amount and term of such deposits."

"30–5–303. *Same; penalty for violation; jurisdiction; costs and fees.*

"(a) Any lessee or operator, purchaser or other party legally responsible for payment who violates the provisions of this article is liable to the person or persons legally entitled to proceeds from production for the unpaid amount of such proceeds, plus interest at the rate of eighteen percent (18%) per annum on the unpaid principal balance from the due date specified in W.S. 30–5–301(a).

"(b) * * * the prevailing party in any proceedings brought pursuant to this article shall be entitled to recover all court costs and reasonable attorney's fees."

Moncriefs claim that the Act does not apply to them in this instance because it is intended to apply to disputes over *who* should receive production proceeds rather than disputes over the *amount* payable. This dispute clearly involves only Moncriefs' failure to pay Harvey the full amount of royalties due and whether this

failure falls within the provisions of W.S. 30–5–303(a).

█ Our primary purpose in construing a statute is to determine the intent of the legislature. Legislative intent should be ascertained, as nearly as possible, from the language of the statute viewed in the light of its object and purpose. *Belle Fourche Pipeline Co. v. State*, 766 P.2d 537, 542 (Wyo.1988).

█ The Royalty Payment Act is a remedial statute. Such statutes are to be liberally construed to achieve their remedial purpose. *In re General Adjudication of Bighorn River System*, 753 P.2d 76, 114 (Wyo.1988), *aff'd* 492 U.S. 406, 109 S.Ct. 2994, 106 L.Ed.2d 342, *reh. denied* 492 U.S. 938, 110 S.Ct. 28, 106 L.Ed.2d 639 (1989); *Vigil v. Tafoya*, 600 P.2d 721, 724 (Wyo. 1979). In *Independent Producers Marketing Corp. v. Cobb*, 721 P.2d 1106, 1110 (Wyo.1986), we expressed the remedial purpose of this Act as follows:

"The district court's application of the Royalty Payment Act in this case is consistent with the legislature's obvious intent to stop oil producers from retaining other people's money for their own use."

Although there is no legislative history available for this statute, the language of the statute itself clearly demonstrates its remedial intent. There is nothing "result oriented" about reading this statute as written. A result oriented decision is one which reaches a decision contrary to the statute but in accordance with the author's personal opinion of perceived justice. This is inappropriate appellate practice which we decline to embrace.

Moncriefs would have us limit the application of this statute to protecting interest owners during the pendency of a dispute over *who* should receive the proceeds of production. Since this dispute did not involve *who*, they claim the statute has no application. They point to the language of W.S. 30–5–302, wherein it provides: "Any delay in determining *any person* legally entitled to an interest in the proceeds from production shall not affect payments to all other persons entitled to payment." (emphasis added) Moncriefs' reading of W.S.

30–5–302 is overly restrictive. The use of the phrase "any person" does not limit the scope of the entire statute.

The clear language of W.S. 30–5–302 concerning the duty to escrow disputed proceeds is determinative:

"In instances where payment cannot be made *for any reason* within the time limits specified in W.S. 30–5–301(a) [the party legally responsible] shall deposit all proceeds credited to the eventual interest owner to an escrow account * * *." (emphasis added)

The words "any reason" in the statute and escrow provisions establish a clear intent to include disputes over the correct *amount* of payment to be made as well as a dispute over the correct *payee*.

█ The Royalty Payment Act also provides protection to the legally responsible payor. The payor needs merely to deposit the disputed proceeds in an escrow account to avoid paying penalty interest. Moncriefs knew that Harvey had never signed the unit agreement and that he contested the amount of royalties due. They might have placed the contested proceeds into an escrow account and avoided penalty interest. They did not do so. We hold, therefore, that the trial court properly determined that Moncriefs' failure to pay royalty proceeds to Harvey brought them within W.S. 30–5–301, *et seq.* and that their failure to place the disputed funds in escrow made them liable for interest pursuant to the statute.

█ Next considered is the date Moncriefs' duty to pay 18 percent interest commenced under the Act. This issue arises because the date of first sale of gas from the well was on January 13, 1981, and the Royalty Payment Act became effective June 1, 1982. The 18 percent penalty imposed acts as a disincentive for oil producers wrongfully to hold back royalty payments, thereby collecting interest on other people's money. In this case, Moncriefs were aware of the "bona fide contract dispute" with Harvey, yet they held back his money, thereby reaping the benefit of possession of money. A "good faith" excep-

tion is incorporated into this statute. It is in the provision which allows a producer to place the contested monies in escrow. By doing so, he avoids improper gain from proceeds which may not be his to begin with.

The district court's order awarded Harvey interest at the rate of seven percent for production prior to December 1, 1982, which was for the six months prior to enactment of the statute. Commencing with the proceeds derived from the sale of production during September 1982, Harvey was awarded interest under the Royalty Payment Act at the rate of 18 percent per year, which began accruing December 1, 1982. *See*, 1982 Wyo.Sess.Laws ch. 27. The Act provides that

> "[t]he proceeds derived from the sale of production from any well producing oil, gas or related hydrocarbons in the state of Wyoming shall be paid to all persons legally entitled thereto, except as hereinafter provided, *commencing not later than six (6) months after the first day of the month following the date of first sale and thereafter not later than sixty (60) days after the end of the calendar month within which subsequent production is sold * * *.*" W.S. 30–5–301(a) (emphasis added).

In this case, the "date of first sale" from the well occurred prior to the effective date of the statute. In *Cobb*, we stated that the Royalty Payment Act sanction

> "is precipitated by the payor's failure to pay the proceeds of production at any time more than six months after the first day of the first month after the date of first sale. * * * The Act is not applied retroactively just because the proceeds happen to be generated by production that occurred prior to the Act's effective date." *Cobb*, 721 P.2d at 1109.

In *Cobb*, we upheld the trial court's order giving IPMC the benefit of the six-month "grace period" imposing the penalty only to the extent that IPMC held the proceeds after December 1, 1982. *Cobb*, 721 P.2d at 1110.

Had the first sale from 16–1 well been made in June 1982 rather than January 1981, the Royalty Payment Act would have been in effect and the Moncriefs would have had six months after the first day of the month following the date of first sale, or until January 1, 1983, to make the first payment to Harvey without facing a penalty, and sixty days after the end of the calendar month within which the subsequent production was sold thereafter to pay without penalty. We see no reason for treating an obligor whose obligation began to accrue *before* the effective date of the Act any differently from one whose obligation arose *after* the Act, so long as the Act is not applied retroactively. Allowing the Moncriefs a six-month grace period does not lead to retroactive application for the same reason that calculating interest after June 1, 1982, on production proceeds unpaid before that date did not in *Cobb*. The Moncriefs are entitled to the same six-month "grace period" that an obligor beginning production after June 1, 1982, would receive.

Since we hold that the first production payment was not "due" for purposes of the statute until six months after the first day of the month following June 1, 1982, the trial court's order making interest accrue commencing with the September 1982 proceeds is erroneous. Interest began accruing on the June 1, 1982 proceeds on January 1, 1983, six months after the first day of the month following June 1, 1982. We therefore modify the district court's order to require interest under the Royalty Payment Act from January 1, 1983.

*Application of the "United States Rule"*

■ The trial court refused to apply the United States rule to allocate partial payments between principal and interest. The United States rule, so called because it comes from the federal commercial common law, holds that in applying partial payments to an interest-bearing debt, in the absence of an agreement or statute to the contrary, the payment should first be applied to the interest due. After the interest obligation is satisfied, any remaining payment may then be credited to principal. *Southern Natural Gas Co. v. Pursue En-*

*ergy,* 781 F.2d 1079, 1088 n. 11 (5th Cir. 1986); 47 C.J.S. *Interest and Usury* § 74 (1982).

The United States rule appears to be the majority rule. It has been adopted by several of our sister states. *See, e.g., Jorgensen v. Aetna Casualty and Surety Co.,* 769 P.2d 809, 813 (Utah 1988); *Security Ins. Co. of Hartford v. Houser,* 191 Colo. 189, 552 P.2d 308, 311 (1976); *Landess v. State,* 335 P.2d 1077, 1079 (Okla.1958). The rule is sound and herewith adopted.

██ The Moncriefs argue that the rule should not apply to this case because their obligation to pay royalty payments was not an "interest-bearing debt." The Kansas case of *Shutts v. Phillips Petroleum Co.,* 240 Kan. 764, 732 P.2d 1286 (1987), *cert. denied* 487 U.S. 1223, 108 S.Ct. 2883, 101 L.Ed.2d 918 (1988), is persuasive. In *Shutts,* the Kansas Supreme Court upheld application of the rule to payment of interest on suspended royalties which Phillips was contractually obligated to pay royalty interest owners, stating the interest provisions of the Royalty Payment Act are sufficient to make unpaid royalty payments an "interest-bearing debt."

*See also Rissler & McMurry Co. v. Atlantic Richfield Co.,* 559 P.2d 25, 31–32, 34 (Wyo.1977), in which we held that liquidated damages may be established and prejudgment interest awarded under a contract which furnishes a fixed standard sufficient to establish a liquidated damage figure, so long as the debtor receives notice of the amount before interest starts to run. The assignments in this case put the Moncriefs on notice that Harvey was entitled to a full five percent royalty. *Rissler* stands for the proposition that once notice and liquidated damages can be established by reference to the terms of a contract, there is an interest-bearing debt.

We distinguish the recent case of *State v. BHP Petroleum Co., Inc.,* 804 P.2d 671 (Wyo.1991), in which we held that the State could not recover interest on unpaid royalties prior to the passage of the Royalty Payment Act on a theory of unjust enrichment because BHP was unaware of the deficiency in royalty payments until 1987 and promptly compensated the State for those underpayments when it became aware of them. BHP was not unjustly enriched since it did not withhold payment after learning that the deficiency existed. *BHP,* 804 P.2d at 673. In this case, by contrast, the Moncriefs were aware of Harvey's failure and refusal to join the unitization agreement and of his five percent overriding royalty interest from at least the time work began on the 16–1 well. Therefore, they are liable for interest prior to the passage of the Royalty Payment Act.

The order providing for attribution of payments to principal and interest is reversed, and the United States rule is applied to the payments.

### Texaco's Joint and Several Liability

Appellant was awarded judgment for the full amount of unpaid royalties against Moncriefs. Judgment was against Texaco for unpaid royalties based on its portion of the production proceeds. Any amount paid by Texaco will reduce the amount owed by Moncriefs. The effect was to make each party liable for its proportionate share of the unpaid royalty payments based on the amount it received from sales of gas from the well.

The Moncriefs received their interest, rights and duties in the lease by assignment from Texaco. Harvey contends that Texaco's assignment to the Moncriefs was in the nature of a "sublease" rather than an assignment making Texaco fully liable as a lessee for all the royalty payments. Due to the nature of Texaco's retained interest, it is unnecessary for us to reach the question of whether the assignment from Texaco to W.A. Moncrief was a "sublease." Because the parties have strenuously argued the application of "assignment-sublease" principle in the context of the law of oil and gas, however, we answer the question presented.

██ We have not heretofore had occasion to consider whether an "assignor" of an oil and gas lease who retains some interest in the lease has made an assign-

ment or a mere sublease. Many courts view such assignment as creating a "sublease." *See, e.g., Irwin v. Marvel Petroleum Corp.*, 139 Mont. 413, 365 P.2d 221, 226 (1961); *Halbert v. Hendrix*, 121 Ind.App. 43, 95 N.E.2d 221, 223 (1950). We decline the invitation to adopt a blanket application of the "assignment-sublease" concept to adjust the rights of interest owners in oil and gas cases.

Commentators on the law of oil and gas have long noted that the assignment-sublease concept seems inappropriately imported into the realm of oil and gas law, particularly where it leads to inequitable results. We agree. *See, e.g.,* R. Hemingway, *Law of Oil and Gas* § 9.11 at 505 (2nd ed. 1983); 1 E. Brown, *Law of Oil and Gas Leases* § 11.04 at 11–28, –29 (2nd ed. 1990); J. Lowe, *Oil and Gas Law in a Nutshell* 350 (2nd ed. 1988) ("the distinction has been largely ignored because it is not recognized by the customs and usages of the industry").

The concept is particularly inapplicable in this case, due to the nature of the interest Texaco retained when it made the assignments to Moncriefs. Under the Farmout Agreement and the assignments to W.A. Moncrief, Texaco retained 50 percent of the *working interest* in the Harvey lease lands outside of section 16. On payout, Texaco would receive back a 50 percent share of the *working interest* known as a "Back–In Interest," in the section 16 lease. Each of these interests is a *proportionate share of the leasehold estate* rather than a mere royalty interest. The concept of a "sublease" simply does not fit this situation.

The rationale employed by the court in *Cherokee Resources, Inc. v. Gold Energy Corp.*, 11 Kan.App.2d 436, 724 P.2d 695 (1986), is more persuasive. In that case, Cherokee Resources, the lessee of a 240–acre tract, assigned 80 acres to Gold. All of the productive wells were on Gold's 80 acres. The Kansas Court of Appeals, although it nominally characterized Gold as a sublessee, made Cherokee and Gold each liable for its share of royalty payments due the lessor in proportion to the amount of acreage each retained. The court stated that "[i]t would seem equitable that the difference should be apportioned between the leaseholders in proportion to their percentage of the total acreage in the lease." *Cherokee*, 724 P.2d at 698.

■ Although in this case the division was of the working interest rather than the leasehold acreage, the principle of proportionate responsibility is most equitable. We hold, therefore, that the trial court properly made each party liable for the royalties due from its proportionate share of the leasehold based on production sold from the well. The trial court's order making Texaco liable for a proportionate share of the amount owed Harvey based on its share of sales is affirmed.

Harvey's other contentions, that privity of estate and privity of contract make Texaco jointly and severally liable, share the same shaky foundation as the sublease argument and are equally inapplicable to the circumstances of this case.

*Texaco's Duty to Pay Interest under the Royalty Payment Act*

■ Texaco owns a working interest in a proportionate share of the 16–1 well. The question is whether Texaco is a "lessee or operator, purchaser or other party legally responsible for payment" under W.S. 30–5–303 subject to payment of interest for wrongfully withheld proceeds. We think not.

Recently the legislature added W.S. 30–5–304(a) (Cum.Supp.1990), defining terms used in the Royalty Payment Act. "Lessee" is defined as:

"(i) 'Lessee' means the person entitled under an oil and gas lease to drill and operate wells, paying the lessor a royalty and retaining the remainder, known as the working interest. The lessee pays all costs of production out of his interest, the lessor's interest being free and clear of all those costs."

"Operator" is defined as:

"(iii) 'Operator' means a person engaged in the business of drilling and producing wells for oil and gas."

We apply these definitions retroactively to this case, because they shed light on the intent of the legislature. Under the terms of the Farmout Agreement between Texaco and the Moncriefs, Texaco gave Moncriefs the right to drill the 16–1 well. Moncriefs assumed all cost, risk and expense of conducting these operations. Under the circumstances, even though Texaco retained a proportionate share of the leasehold interest, only Moncriefs were "lessees" or "operators" within the limited definitions of W.S. 30–5–304(a).

Texaco was not legally responsible for the actual remittance of its share of royalties to Harvey. We will not hold that the non-executive owner of a working interest is responsible for remittance out of its share of the proceeds for purposes of calculating penalty interest. Since Texaco was not legally responsible for interest under the Royalty Payment Act, it follows, under the rationale in *BHP Petroleum*, 804 P.2d 671, that it was not liable for the seven percent interest ordered by the trial court either. We therefore reverse the trial court's order assessing interest against Texaco.

*Attorney Fees*

The Royalty Payment Act also provides that "the prevailing party in any proceedings brought pursuant to this article shall be entitled to recover all court costs and reasonable attorney's fees." W.S. 30–5–303(b). The trial court's order stated that attorney fees should not be assessed against Texaco. Harvey was given judgment for attorney fees and $25.00 court costs against Moncriefs.

Harvey claims the Act entitled him to recover attorney fees and costs against Texaco. Since Texaco is not an operator, lessee or other person responsible for payment under the Royalty Payment Act, Texaco is not liable for attorney fees or costs under the Act.

We affirm the trial court's refusal to tax attorney fees and costs against Texaco.

*Amount of Attorney Fees Awarded against the Moncriefs*

The Moncriefs claim that the award of attorney fees is unsupported by findings that the amount awarded was reasonable. In *UNC Teton Exploration Drilling, Inc. v. Peyton*, 774 P.2d 584 (Wyo.1989), we adopted a two-stage analysis that the court must follow when determining whether a claim for attorney fees is reasonable:

First, the trial court should apply the "lodestar" test, adopted from *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), which is summed up in *UNC Teton*, 774 P.2d at 595, as "the product of reasonable hours times a reasonable rate."

Second, the trial court makes discretionary adjustments to the lodestar amount using the following factors from *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 718–19 (5th Cir.1974):

(1) The novelty and difficulty of the questions;
(2) the skill requisite to perform the legal service properly;
(3) the preclusion of other employment by the attorney due to acceptance of the case;
(4) the customary fee;
(5) whether the fee is fixed or contingent;
(6) time limitations imposed by the client or the circumstances;
(7) the amount involved and the results obtained;
(8) the experience, reputation, and ability of the attorneys;
(9) the "undesirability" of the case;
(10) the nature and length of the professional relationship with the client; and
(11) awards in similar cases.

Cited in *UNC Teton*, 774 P.2d at 595.

Moncriefs claim that the trial court failed to follow this analysis in awarding attorney fees against them in this case. Evidence was presented in support of the fee award. On February 15, 1990, Harvey presented an exhibit detailing the fees charged by his attorneys. Counsel for the Moncriefs did not object to the reception of this exhibit.

The exhibit contained an extensive affidavit by Richard Gose setting forth his charges in *Harvey v. Moncrief.* Attached were detailed billing statements from Mr. Gose; from Holme, Roberts and Owen; from Hand and Hand; and from Ernest Carroll. A lawyer/expert witness for Harvey testified at the hearing that the fees charged were reasonable. After the hearing, on February 20, 1990, Mr. Hand submitted a letter to the district court in which he broke down the attorney fee exhibit to show the amount attributable to expenses.

In its decision letter of April 6, 1990, the trial court stated:

"It is the Court's conclusion that the defendant [sic] met its burden of reasonableness as to the above mentioned attorney's fees, and the same are approved * * *."

An order was later issued incorporating the decision letter.

█ Moncriefs now complain that neither the court's decision letter nor its order reflect any consideration of the *UNC* second-stage factors because no specific findings were made on these factors in the decision letter or order. Rule 52, W.R.C.P. states:

"(a) *General and special findings by court*—Upon the trial of questions of fact by the court, or with an advisory jury, it shall not be necessary for the court to state its findings, except generally for the plaintiff or defendant, unless one of the parties requests it before the introduction of any evidence * * *."

Moncriefs made no request for special findings with regard to the trial court's award of attorney fees. The trial court's order, therefore, sufficiently set forth its holding on the attorney fee issue.

Moncriefs also claim that there was insufficient evidence before the trial court to determine the billing rates of the attorneys or the hours expended, in order to perform the "lodestar" test. At the hearing on attorney fees, Harvey's expert witness testified as follows concerning his review of the exhibits:

"Q. In your review of the Attorney Fee exhibits, have you noted the hourly rates

that are charged by these respective persons or attorneys?

"A. I believe I have. Mr. Nance charged, I believe it was $210 an hour. David Steefel $175. Mr. Jerry Hand approximately $100 to $110. Mr. Gose also in that approximate range. Mr. Carroll's, right now I don't remember offhand.

"Q. As a matter of fact, he didn't say what they are, did he? The exhibit won't reveal—

"A. What Mr. Carroll charged.

"Q. What it was?

"A. It could probably be computed but I don't recall that right now what his rate was."

The itemized bills set forth in the fee exhibit clearly reveal the hourly rate and hours worked by Mr. Gose and Holme, Roberts and Owen. Itemized statements showing the total amount billed and services performed were provided for Hand and Hand and Ernest Carroll.

█ Moncriefs' position appears to be that the lodestar test cannot be performed without a breakdown explicitly showing the number of hours worked and the hourly fee. We disagree. Where there is other evidence, such as an itemization of the work performed and the amount charged for specific work, an experienced trial judge can determine whether the lodestar test is met or not.

There was sufficient evidence before the trial court for it to perform both steps of the analysis required by *UNC Teton.* There was no abuse of discretion in the result reached. We therefore affirm the trial court's award of attorney fees.

*Conclusion*

We affirm the challenged orders with the exception of those orders or parts thereof denying application of the "United States rule" fixing September 1, 1982, as the commencement date for calculation of interest owed by the Moncriefs and requiring Texaco to pay interest on unpaid royalty proceeds which are reversed, and we remand

to the district court for entry of a modified judgment consistent with this opinion.

URBIGKIT, C.J., filed a dissenting opinion.

ROONEY, J. (Retired) filed a dissenting opinion in which URBIGKIT, C.J., joined.

URBIGKIT, Chief Justice, dissenting.

I join in the dissent of Retired Justice Rooney in agreement that the free ride given by the majority's decision to M.J. Harvey, Jr. is not justified by permitting escape from an oil field unitization. Had the fates turned otherwise so that it would have been specifically for Harvey's benefit to have an interest within the unit whether or not he originally consented, then certainly the claim would be inclusion, not exclusion.

I do not find either documentary requirement or general standards in oil production practice which justify the majority's decision. An extraordinary additional cost for Wyoming oil and gas development will likely result from the veto power now provided to fractional overriding royalty interest holders. Properly analyzed, Harvey's assignment ended his status under the lease as a lessee of state lands. Under no circumstances would I conclude that the base lease demonstrates intent within its proper construction for the assignor, who only retained a small overriding royalty interest, to remain independently able to determine his separate nonparticipation. Consequently, I join Retired Justice Rooney in his cogent analysis and conclusion.

Additionally, I dissent to the majority's construction of the 1982 Royalty Payment Act, now the 1989 Royalty Payment and Reporting Act. Although the Act as finally presented received an overwhelmingly favorable vote in the legislature, it is hardly likely that the same result would have been achieved if the legislature had anticipated the provisions would extend beyond title dispute concepts providing a retention of proceeds requirement to move statutory penal provisions now into other broad issues of oil development contractual controversy and court litigation.[1]

The severest of penalty, incurred attorney's fees and eighteen percent interest, was never reflected by phraseology within the Act to include application to participating general interest holders with direct disputes about their contractual rights. This decision broadly adds the Royalty Payment and Reporting Act as a term to general participation, partnership and production agreements now in usage in the industry. If the claim is developed to be underpayment of proportionate proceeds in value or amount, then this decision adds attorney's fees and eighteen percent interest to the successful litigant's prize. Nowhere else in law is such a heavy statutory penalty between contracting parties provided when an honest dispute might exist. The existence of an honest dispute here can be observed from the three to two decision by which the basic issue in contest will be decided in this court.

It is terribly unfortunate that legislative history is nearly totally unavailable for understanding the actions of the Wyoming State Legislature. Without direction of that history, the result and responsibilities of this court may well be result-oriented adjudication far removed from what the actual intent of the legislature initially was because no other informative basis for stat-

1. When initially introduced as S.F. No. 8, 46th Leg., Budget Sess. (Wyo.1982) under the sponsorship of the Senate, the initial file included reference to unmerchantable title with determination to be made in accord with title standards accepted by the Wyoming State Bar. S.F. 8 was then significantly rewritten and sponsored by both Senate and House members as S.F. 8A, but retained its intrinsic character considering in essence stakeholder concepts when disputes about interest ownerships might develop. The obvious theory of the law was to foreclose eco- nomic benefit to the producer in delayed determination of recipients. See S.F. No. 8A, 46th Leg., Budget Sess., Digest of Senate and House Journals (Wyo.1982). This was the apparent reason for the escrow provision since, as a third-party transaction, the escrow was protection for the obligor but would eliminate economic benefit in fund retention arising as a perceived conflict in interest when title controversies developed which permitted money usage by obligor during delayed pay out period.

utory intent analysis exists.[2]  *Cf. Allied–Signal, Inc. v. Wyoming State Board of Equalization,* 813 P.2d 214 (Wyo.1991), Urbigkit, C.J., specially concurring.

Wyo.Sess.Laws, ch. 27 (1982) was significantly extended by Wyo.Sess.Laws, ch. 255 (1989) when the later enactment added comprehensive provisions for collection, reporting and remittance of royalties.  The negative denigration of division orders and the affirmative detail for reporting and payment provide no further historical evidence that the royalty payment and reporting law was intended to extend to basic disputes such as the effect of unitization presented here.  Substantively, I would concur with the decision of the United States District Court for the District of Wyoming in its Order on Motions for Summary Judgment in *Prenalta Corp. v. Colorado Interstate Gas Co.,* No. C89–1010–B, (D.Wyo. Aug. 11, 1989).  By that order, United States District Judge Clarence A. Brimmer provided an accurate analysis of intent to apply the statute to "situations where there is difficulty determining a person legally entitled to the proceeds from production."  *Id.* at 13.

The Royalty Payment and Reporting Act, *circa* 1989, is punitive legislation providing penalties of both attorney's fees and eighteen percent interest.  The law is generally well settled and specifically in this jurisdiction that the scope of punitive legislation and its provisions should not be extended by implication.  As Justice McClintock in *Title Guaranty Co. of Wyoming, Inc. v. Belt,* 539 P.2d 357 (Wyo.1975) appropriately recognized, where a statute is a penal one it must be strictly construed and

> "cannot be extended by implication or construction to persons or things not expressly brought within its terms, nor to cases not within the letter of the statute; and also, that 'all doubts as to the con-

structions are resolved in favor of the defendant.' "

*Id.* at 360 (quoting *State v. Thompson,* 15 Wyo. 136, 87 P. 433 (1906)).  This standard and uniform rule had its initiation in the early cases of *People ex rel. School Dist. No. 3 in Laramie County v. Dolan,* 5 Wyo. 245, 39 P. 752 (1895) and *Haines v. Territory,* 3 Wyo. 167, 13 P. 8 (1887).  Cogent restatement of their principle can be more recently found in *Attletweedt v. State,* 684 P.2d 812 (Wyo.1984) and *Horn v. State,* 556 P.2d 925 (Wyo.1976).

I would not extend the Royalty Payment and Reporting Act by construction to punish bona fide contract disputants who have basic differences about interest rights or royalty requirements as differentiated from admitted obligations with dispute only as to who is the proper party for an admitted payment.

In finding that the majority extends this punitive legislation by construction far beyond the initial legislative purpose or the clearly provided text of its provisions, I respectfully dissent.  The expansive scope of this Act now provided by the majority's decision reaches litigation far removed from a normal royalty owner's protection enactment.  See, for example, *Prenalta Corp.,* No. C89–1010–B, which considers basic pricing and value questions.  Likewise involved would be value disputes regarding royalty payments.

For an obvious reason, since I reject Royalty Payment and Reporting Act application in this case, I also dissent to the reversal of the trial court's decision which did not apply the interest application rule.  I neither agree nor disagree with the decision to adopt that principle for Wyoming usage when it may come up in a proper case as comprehensively briefed, but do not approve the present trial court reversal and consequent application here within the factual situation of a statutory construction

---

**2.**  For example, because of the nature of its sponsorship, it is possible that some written bill analysis statements providing information about the legislation were given for distribution on the legislative floor to the membership during debate.  Committee session handouts may have and probably did exist to provide details and statement of purpose.  None of this material is retained as a permanent legislative record and, consequently, the factual basis upon which passage was obtained can only be implied to determine intent as the adjudicatory construction of the statute later develops.

determination. Not only has this court extended the royalty payment statute by construction far beyond what I perceive the original intent would have justified, *Allied–Signal, Inc.*, 813 P.2d 214 (1991), but now further supplements and extends the statute by affixing upon it an interest attribution scheme which affords further penalty upon the producer or payment obligor who, in contested royalty rights cases, comes to litigative dispute. Mathematically, we add another element of penalty to the statutory result. *Belt*, 539 P.2d 357.

I would agree with Moncrief that this inclusion-exclusion unit agreement dispute did not create in itself an interest bearing debt and, consequently, the authorities cited of *Southern Natural Gas Co. v. Pursue Energy*, 781 F.2d 1079 (5th Cir.1986) and 45 Am.Jur.2d *Interest and Usury* § 99 (1969) do not control. *Southern Natural Gas Co.* related to a jurisdiction which provided a specific statutory interest-principal allocation provision which was found by the federal court to be controlling. Likewise is *Jorgensen v. Aetna Cas. & Sur. Co.*, 769 P.2d 809 (Utah 1988), involving an interest bearing obligation, while *Security Ins. Co. of Hartford v. Houser*, 191 Colo. 189, 552 P.2d 308 (1976) and *Landess v. State*, 335 P.2d 1077 (Okl.1958) involve the distinguishable subject of post-judgment interest where partial payments on a judgment were made by the judgment debtor in presentation of a subject overtly different from a statutorily created penalty which is the subject of the present Royalty Payment and Reporting Act.

ROONEY, Justice, Retired, dissenting.

I cannot agree with the district court and with the majority of this court in their determination that the consent to unitization by Harvey, as a holder of an overriding royalty interest in production of minerals from a lease of state lands, was necessary to make such interest subject to the unitization. Harvey had been a lessee of state land involved in the unitization, but he ceased to be a lessee when he assigned it to another. His retention of a royalty interest left him with only a non-possessory interest. The new lessee consented to unitization.

The majority of the court presents the issue before us as follows:

" 'The relevant portion of the state lease reads as follows:

" 'Section 3. The lessor [State of Wyoming] expressly reserves:

\*     \*     \*     \*     \*     \*

" '(c) The right, *with consent of the lessee*, to commit the herein leased lands in a unit or co-operative plan of development, and to establish, alter, change or revoke the drilling, producing, and royalty requirements of the lease *to conform therewith.*' (emphasis added)

" 'The question presented is whether, by the phrase "consent of the lessee," the State bound itself to obtain consent to unitization from a lessee who assigned the lease but retained an overriding royalty interest.' "

In addressing this issue, the majority of the court acknowledges that "[i]f a contract [lease] is in writing and the language is clear and unambiguous, the intention of the parties is found in the words of the contract." But it then proceeds to disregard the words of the contract and attempts to ascertain that which the parties "may have had in mind" and by searching for that implied in the lease.

The majority of the court acknowledges the lease to be "clear and unambiguous." The word "lessee" has a well recognized meaning. It is a word in regular usage in everyday activities. The parties do not contest the fact that Harvey is no longer the lessee under the state lease. This lease is plain in referring only to the "lessee's" consent and not to that of others who have an incidental interest in the lease, such as the non-possessory interest of Harvey. After recognizing that the intention of the parties is to be found in the "words of the contract," the majority of the court proceeds to do otherwise.

In reviewing the rules for construing contracts, Justice Thomas stated the following in *Shepard v. Top Hat Land and*

*Cattle Co.*, 560 P.2d 730, 732 (Wyo.1977) (emphasis added):

> "If the language of the contract is plain and unequivocal that language is controlling and the interpretation of the contractual provisions is for the court to make as a matter of law. The meaning of the instrument is to be deduced *only* from its language if the terms are plain and unambiguous.

> \* \* \* \* \* \*

> "All the parts of and every word in the contract should, if possible, be given effect, *avoiding a construction which renders a provision meaningless because the presumption is that a particular provision is placed there for a purpose.*"

There is no question but that the language of the lease is plain and unequivocal in limiting any required consent to unitization to the "lessee," and there is no question that Harvey is no longer a "lessee."

Although asserting otherwise, the majority opinion treats the lease as containing an ambiguity. "An ambiguous contract is an agreement which is obscure in its meaning because of indefiniteness of expression or because of a double meaning being present." *Farr v. Link*, 746 P.2d 431, 433 (Wyo.1987). "An 'ambiguous contract' is one capable of being understood in more ways than one." *Bulis v. Wells*, 565 P.2d 487, 490 (Wyo.1977). There is no double meaning in the word "lessee." It cannot be understood in more ways than one. It says exactly what it says.

The foregoing is also true when applied to the statute authorizing the State through the Board of Land Commissioners to enter into a unitization agreement. W.S. 36–6–101(d) provides in pertinent part:

> "The board, on behalf of the state, and its lessee or lessees in any such mineral lease are hereby further authorized to join, in the interest of conservation and greater ultimate recovery of oil and gas, in fair and equitable cooperative or unit plans of development or operation of oil and gas pools, with the United States government and its lessees[.]"

If there is any ambiguity in the statute, it is one making even the consent of the lessee or lessees unnecessary, i.e., reading it to authorize the board to act *on behalf of* the state *and* its lessee and lessees, to join, etc. And, of course, the Board cannot act by rule, contract, lease or otherwise beyond that authorized by statute, such as requiring consent to unitization beyond those designated by the statute.

Of immediate importance of the statute is its emphasis on "conservation and greater ultimate recovery of oil and gas" through such as "unit plans." These objectives should not be thwarted by allowing an outsider, even one with a non-possessory interest, to void or veto the "fair and equitable" operation of a unit. Harvey is receiving his fair share of the proceeds of the minerals removed from the pool underlying the lands of the unit (including the land covered by his former lease). If the well had been drilled on land adjacent to this lease, he certainly would accept the fair share now paid to him rather than nothing under the contention which he here puts forth. And, of course, the state would also receive nothing for its share of the oil drained from under this lease. Courts should do equity, and equity requires Harvey to be satisfied with that due him under the unit in return for his having done no more than obtain a lease of state land which he subsequently assigned to another before drilling was commenced.

Since the other issues on appeal are pertinent only if there is an affirmance on this issue, a reversal on this issue makes unnecessary consideration of the other issues. I would reverse on this issue, and remand the case with instructions to deny plaintiffs' motions for summary judgment and to grant defendant's motion for summary judgment.

For these reasons, I respectfully dissent.

### ORDER DENYING PETITION FOR REHEARING

This case came before the Court upon the Petition for Rehearing filed by appellants, and a Motion for Leave to File Brief as Amicus Curiae and Brief of Howard R.

Williams as Amicus Curiae, and the Court, having examined carefully the file and record, together with the opinion of the Court filed July 18, 1991, and being fully informed in the premises, finds that the Motion for Leave to File Brief as Amicus Curiae should be granted and that the Petition for Rehearing should be denied; and it therefor is

ORDERED that the Motion for Leave to File Brief as Amicus Curiae be, and the same hereby is, granted; and it is further

ORDERED that the Petition for Rehearing filed herein be, and the same hereby is, denied.

URBIGKIT, C.J., and ROONEY, J. (Retired), would grant rehearing.